THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DENISE TURNIPSEED, Defendant-Appellant.

First District (2nd Division)    No. 1—93—1674

Opinion filed July 25, 1995, *nunc pro tunc* July 18, 1995.

McCORMICK, J., dissenting.

Rita A. Fry, Public Defender, of Chicago (Joseph Gump, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Katherine Schweit, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Following a bench trial, defendant Denise Turnipseed was convicted of possession of a controlled substance with intent to deliver and possession of cannabis with intent to deliver. She was sentenced to a nine-year prison term for possession of a controlled substance with intent to deliver. On appeal, defendant contends that the circuit court erred in denying her motion to suppress the evidence. Specifically, she argues that a search of her person exceeded the scope permitted under *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, that she did not voluntarily consent to a search of her apartment and that the police needed a warrant to break open two safes seized from the apartment.

At a hearing on the motion to suppress, Chicago Housing Authority police officer Robert Marszalek testified that at 3:15 p.m. on November 4, 1992, he and Officer Timothy Hatcher went to 730 East 39th Street in response to a report of a woman with a gun. The dispatcher described the suspect as a 30-year-old black woman, who was wearing a brown coat and blue jeans. Marszalek stated that when they arrived, they observed defendant, who fit the description, arguing with her neighbors in the building lobby. The neighbors asked the police to persuade defendant for an extension of time to pay the $50 they owed her for crack cocaine. When Marszalek replied that their concern at the time was whether someone had a gun, the neighbors stated that defendant had a gun and threatened them with it if they did not pay the drug debt.

Marszalek testified that at that time, they conducted a pat-down search of defendant, recovered two rounds of ammunition and a small packet of cannabis and placed her under arrest. After defendant was arrested and given the *Miranda* warnings, she allowed the officers to enter her apartment, stating that she had nothing to hide. The officers did not have a consent-to-search form with them and did not request one from the assisting units. Defendant opened the door to the apartment using her key, and the officers observed rounds of ammunition scattered on the floor. At that point, defendant walked quickly into a bedroom. Marszalek, who followed immediately behind her, observed her run toward an open safe and slam the door of the safe shut. Before she closed the door, Marszalek observed a white

powdery substance in a plastic bag inside the safe, which he believed was crack and cocaine. The safe was stacked on top of another safe, which was closed. The officers then handcuffed defendant and continued their search. They observed two "high-tech" scales, a large bowl containing a pasty substance that could be used to make the base for crack cocaine, pipes and additional drug paraphernalia. The officers inventoried the items, took the safes to the police station and pried them open.

Defendant testified at the suppression hearing that she was talking to the building president when the police arrived and asked her if she had a gun and then searched her, but found nothing. One officer told defendant that they were going to her apartment. Defendant responded that she had been searched and that they were not going to her home. The officer then grabbed her by the shoulder, and they went to her apartment. When they arrived at her apartment door, defendant asked the officer to leave, but he refused. After she unlocked the apartment door, the police pushed her inside and handcuffed her to a weight bench while they searched the apartment. Defendant stated that the officers broke down the locked door of her son's bedroom and removed two safes. Defendant denied ownership of the safes and stated that she did not have the combination. Defendant refused to sign a consent-to-search form at the police station.

The circuit court denied defendant's motion to suppress the evidence. The court found that Officer Marszalek's testimony was more credible than defendant's. The court noted that defendant testified that she did not want the police to enter her apartment. She could have prevented them from entering, however, by not unlocking her apartment door. The court also found that defendant was arrested in the lobby of her building and that she consented to the search of her apartment. Finally, the court found that the officers were able to see the cocaine in the safes and that there was no reason to obtain consent for the removal of the safes because defendant denied ownership of them.

Defendant first argues that the police lacked probable cause to arrest her and that the search of her person exceeded the scope permitted under *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. She cites several cases stating the proposition that a police officer exceeds his authority under *Terry* when, while conducting a protective pat-down, he seizes an object which he knows is not a weapon. See *People v. Creagh* (1991), 214 Ill. App. 3d 744, 748, 574 N.E.2d 96.

■ Initially, we disagree with defendant's characterization of the police conduct as a *Terry* stop. The police responded to a call concern-

ing a woman with a gun and found defendant, who met the description, arguing with her neighbors over a drug debt. The neighbors informed the police that defendant had a gun and threatened to use it if they did not pay her what they owed. Other than asserting that the neighbors were "simply not credible," defendant cites no authority and makes no argument that the facts known to the officers at that time were insufficient to establish probable cause for her arrest. We find that they were sufficient to indicate probable criminal activity, and that the contraband was found during the course of a lawful search incident to the arrest. See *People v. Hoskins* (1984), 101 Ill. 2d 209, 216, 461 N.E.2d 941, citing *United States v. Robinson* (1973), 414 U.S. 218, 235, 38 L. Ed. 2d 427, 440-41, 94 S. Ct. 467, 477.

■ Defendant next contends that the circuit court's finding that she voluntarily consented to a search of her apartment was manifestly erroneous. She maintains that her testimony that she refused consent was more credible than Officer Marszalek's testimony and was supported by the fact that she did not sign a consent-to-search form. She also argues that her arrest was a coercive circumstance that rendered the consent involuntary.

Conflicts in testimony must be resolved by the trier of fact based upon the credibility of the witnesses. (*People v. Buie* (1992), 238 Ill. App. 3d 260, 269, 606 N.E.2d 279.) A reviewing court will not disturb the circuit court's finding on a motion to suppress unless that finding is manifestly erroneous. *People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766.

Whether consent has been voluntarily given is a factual determination made by the circuit court which the reviewing court will accept unless it is clearly unreasonable. (*People v. DeMorrow* (1974), 59 Ill. 2d 352, 358, 320 N.E.2d 1.) The fact that defendant was under arrest does not, standing alone, establish that the consent was involuntary. *People v. Holliday* (1983), 115 Ill. App. 3d 141, 143, 450 N.E.2d 355.

The circuit court's determination concerning consent was based on the credibility of the witnesses. Defendant herself testified that she used her key to allow the police officers entry into her apartment. This is a significant factor that supports the court's finding of consent. We find no basis to conclude that the circuit court's finding was clearly unreasonable.

■ Finally, defendant contends that by slamming shut the door to the safe, defendant effectively revoked her consent to search and that the police needed a warrant to break open the safes at the police station.

If defendant did revoke her consent, the revocation came too late;

the officers had already seen the contents of the safe. Furthermore, defendant repeatedly denied owning the safes.

The question remains whether the officers needed to obtain a warrant before searching the safes. The "plain view" doctrine "authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." (*Illinois v. Andreas* (1983), 463 U.S. 765, 771, 77 L. Ed. 2d 1003, 1010, 103 S. Ct. 3319, 3324.) Here, defendant's consent lawfully permitted the officers to enter her apartment. The officer was also able to view what he thought was cocaine in the safe. Finally, the drug paraphernalia in the apartment certainly gave the officer probable cause to suspect that the white powdery substance in the bags was connected with criminal activity. The circuit court's conclusion that the cocaine was properly seized from the safe was not manifestly erroneous.

■ The record reveals that no sentence was imposed on defendant's conviction for possession of cannabis with intent to deliver. The final judgment in a criminal case is the sentence; where no sentence is imposed, an appeal cannot be entertained. (*People v. Caballero* (1984), 102 Ill. 2d 23, 51, 464 N.E.2d 223.) Accordingly, we need not consider the propriety of the warrantless search of the safe in which the cannabis was found.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

DiVITO, J., concurs.

JUSTICE McCORMICK, dissenting:

I accept the often pronounced adage that truth is stranger than fiction. However, when sworn testimony exceeds the bounds of human experience, it takes on a fairy tale-like quality and we should give very little credence to it. In a fairy tale all things are possible. Princes spring from frogs, princesses wear glass slippers and straw can be spun into gold. In life there are limits. My common sense and experience in the affairs of life tell me that there is not a grain of truth to the State's case. The trial court's findings of fact are incredible and clearly erroneous.

A good fairy tale starts off with a scene that sets up the problem. The good King says, "I will betroth my beautiful daughter and give all the riches of my kingdom to the one who can perform these feats."

Usually there follows a litany of impossible tasks: slay the impenetrable, ferocious dragon, extinguish the fires of the tumultuous volcano or prove to the magistrate that Turnipseed consented to the search of her apartment by the police. Hence, the police here, taking up the gauntlet like Mother Goose or the Brothers Grimm, wove the following tale of conquest:

The police responded to a report of a woman with a gun in a public housing project. Upon entering the high-rise building, the police observed Turnipseed, who fit the description of the woman with the gun, in the lobby of the building arguing with some of her neighbors. A verbal altercation, but no weapon they observed. The officers approached and inquired. They learned from the neighbors that the argument was over a debt they owed to Turnipseed for the purchase of crack cocaine. The neighbors asked the officers, in the name of the peace, to plead with Turnipseed on their behalf for an extension of time to pay the drug debt. It is indeed comforting to know that the citizenry has such confidence in our constables to amiably and peaceably resolve any dispute; that they would feel so comfortable disclosing drug transactions and in seeking their assistance to obtain an extension of time for payment. The Officer Friendly and community policing programs have made inroads into dissipating traditional community distrust in ways heretofore unimaginable. Positively Homeric. (Elvis lives.)

The officers, however, informed the neighbors that they were not charged with that office and could not "help with these problems." Their charge was to thwart the villain who was reported to wield a gun. The good neighbors also then availed themselves of the opportunity to weave straw into gold. "Hence, good lords," the neighbors said, "it was Turnipseed who did threaten us with the weapon of which you speak." With that, one of the officers performed a protective pat-down search of Turnipseed's person, which revealed what she had therein concealed: a couple of rounds of ammunition and a packet of cannabis. Turnipseed was placed under arrest and "Mirandized" in the building lobby. No criminal complaint did the good neighbors sign, nor did the officers' report reveal what they did find on Turnipseed's person or make reference to the good neighbors' request for their assistance with the drug debt.

The golden threads of the police officers' picturesque tale do not end at this point. Instead, the warp of their tapestry becomes more twisted. According to the officers, Turnipseed, now under arrest, in custody and duly "Mirandized," was taken by the police officers to her apartment, on the fifth floor, to look for a gun. In front of Turnipseed's apartment door, on the public portion of the premises, the po-

lice officers, versed in the constitutional limitations on unreasonable search and seizure, inquired as to whether they could enter Turnipseed's apartment. "Why, yes, kind sirs," Turnipseed replied, "I have nothing to hide." Thus, "Forsooth," say the officers, "Turnipseed consented to our entry into her apartment."

Turnipseed's "consent" proved to be the most enormous fabrication since the wolf told little Red Riding Hood that he was her grandmother. Under arrest, in the custody of two police officers and duly "Mirandized," Turnipseed opened the apartment door with her key. Upon entering, she began walking quickly, almost trotting, to the back bedroom. The police gave chase. Turnipseed, they knew, was under arrest and suspected of having a gun in her apartment. Oh, if only they had handcuffed Turnipseed or at least physically restrained her!

Obviously, upon reflection, Turnipseed remembered that her fabrication had been quite imprudent. She did have something to hide. Turnipseed "entered the bedroom to the right" and ran toward an opened safe, which was on top of a closed safe. She slammed the safe door shut, locking the door. She was immediately handcuffed by one of the police officers. However, before Turnipseed slammed and locked the safe door, both police officers, while in hot pursuit of Turnipseed, observed plastic bags inside the safe, in plain view, "containing a white powdery substance." The officers suspected the substance to be narcotics. Also in the apartment, again in plain view, were rounds of ammunition scattered on the floor, a box of ammunition near the bed, a couple of expensive high-tech scales, a large bowl containing a pasty substance, "which looked like it typically could be used to make the base for *** crack cocaine," and all sorts of pipes and other drug paraphernalia. Turnipseed's fabrication had been most imprudent indeed.

The police carried the two locked safes to the police station where, lo and behold, without the aid of the U.S. Constitution or judicial process, but with hammer and crowbar, they forcibly opened the doors to both safes and removed the contents without mar.

Back to reality! Despite what they witnessed and all that they saw, the officers failed to mention the plain violation of the law in their police report. They did not indicate that they saw the white powdery substance inside the safe, while pursuing Turnipseed before she slammed the safe's door shut. Quite the contrary, the police report states that Turnipseed was arrested *after* the police opened the safe and that the one small bag of cannabis was found in her coat during a custodial search *after* the arrest. Factual details, however, have little place in fairy tales.

Turnipseed also testified that the police searched her in the lobby, found nothing, and did not arrest or "Mirandize" her. Turnipseed further stated that as she opened her apartment door the police forced their way in, handcuffed her to a weight bench, and broke down the door to her son's bedroom where the safes were located. At the police station, Turnipseed stated that she did not know the combinations to the safes and refused to sign a consent form for the search of her apartment. A lugubrious account of sobering facts, destroying the very fiber of this most carefully woven tale.

The trial court resolved the issue of credibility in favor of the State and everyone lived happily forever after. Everyone, that is, except Turnipseed, the people, and the United States Constitution. For never was there a tale of more misdeed, than this of the State and Miss Turnipseed.