THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEVIN COOPER, Defendant-Appellant.

First District (3rd Division)   No. 1—95—1042

Opinion filed August 7, 1996.

# 87

GREIMAN, J., concurring in part and dissenting in part.

Rita A. Fry, Public Defender, of Chicago (Protase M. Tinka, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb, Alan J. Spellberg, and Melissa Durkin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:[1]

A jury found defendant, Kevin Cooper, guilty of heinous battery (720 ILCS 5/12—4.1 (West 1992)) and aggravated battery of a child (720 ILCS 5/12—4.3 (West 1992)). He was sentenced to 30 years in the Illinois Department of Corrections for the heinous battery conviction. He was not sentenced for the aggravated battery of a child conviction because it is a lesser offense of heinous battery. At trial defendant represented himself, *pro se*. He is represented by counsel on appeal.

On appeal, defendant contends that (1) the State failed to prove beyond a reasonable doubt that the child suffered severe and permanent disfigurement as required by the heinous battery statute; (2) he was not proven guilty of either heinous battery or aggravated battery of a child beyond a reasonable doubt; (3) he was denied a fair trial

[1]The opinion was authored prior to Justice Rizzi's retirement.

because the trial court refused to "explicitly" respond to a question posed by the jury during deliberation; and (4) his sentence was excessive. We affirm the judgment of conviction for heinous battery but reduce the sentence, and vacate the incomplete judgment of conviction of aggravated battery of a child.

On the morning of February 12, 1994, Chicago police officers responded to a call to investigate a case of extreme domestic battery at 24 West 108th Street in Chicago. They waited in their car at that location until the complainant, Demetrice Pruitt, arrived. When Pruitt arrived in a car, she told the police officers that the defendant was her boyfriend and that he was in the house with her baby, Reggie Pruitt, who was burned, and that he would not release the baby. She also told the police that she was not married to the defendant, and he was not her baby's father.

Pruitt was highly agitated and crying uncontrollably. She told the police officers that the defendant had held her and her baby hostage since January 11, 1994, and that he had an automatic pistol in the house. Meanwhile, the defendant who had been peering out of the window of the house opened the door. One of the police officers asked the defendant if Pruitt could have her baby, and defendant said "Yes." When the police officer told Pruitt to go into the house to get her baby, she replied: "I'm not going in there by myself." One of the officers said that an officer would accompany her into the house. Defendant said: "Police are not coming in here."

The defendant opened the door, but Pruitt was reluctant to go inside. Defendant said: "Come on in here, but the police can't come in." Pruitt again refused to enter the house by herself. One of the officers then guided Pruitt toward the defendant, and when he attempted to grab Pruitt, the officer grabbed the defendant and the two men struggled. The officer subdued the defendant and handcuffed him. When he was asked where the baby was, defendant said that he was upstairs. Another officer then went upstairs and found Reggie. The officer saw that Reggie was burned "pink." Defendant then told Pruitt: "I'm going to get you."

After securing the defendant in a police car, one of the officers toured the house in an attempt to discover the source of Reggie's injury. He looked for a tub, large dish pan, or pail which could have been used to inflict the injury. He found the bathtub in the bathroom, but he did not find any pan or pail. The officer ran the water in the bathroom and noted that it was "extremely hot."

The police officers wrapped Reggie in a blanket and took him to Roseland Hospital's Emergency Room (Roseland). One of the officers was in the emergency room when treatment was administered. He

described Reggie's injury as "a complete saturated burn starting about mid-chest up to and including his thighs, buttocks, scrotum and penis."

Ruth Mills was the registered nurse who treated Reggie when he arrived at Roseland. Mills saw no evidence of Reggie receiving any treatment for his burns prior to his arrival at Roseland. Before administering treatment, Mills obtained Reggie's history from Pruitt. Pruitt told Mills that her boyfriend threw hot water on the baby because he "boo-boo'ed" on himself. Mills understood this to mean that the baby defecated on himself. In treating Reggie, Mills noted first and second degree burns on Reggie's buttocks, thighs and penis. Mills stated that because second degree burns remove enough skin to expose the victim's nerve endings, but are not deep enough to destroy the nerve endings, second degree burns are excruciatingly painful.

As Roseland was not equipped to treat Reggie's wounds, he was transported to Wyler Children's Hospital at the University of Chicago. Dr. Rodger Pielet treated Reggie at the University of Chicago burn center on February 12, 1994. At trial, Dr. Pielet was qualified as an expert in the fields of plastic and reconstructive surgery. His specialty includes burn management and burn reconstruction. Dr. Pielet observed that Reggie had thermal burns, which result from exposure to a hot substance, covering approximately 10% of his body. Dr. Pielet classified Reggie's burns as partial thickness or second degree burns, indicating that the burns went through the epidermis, the top layer of skin, into the dermis, the second layer of skin. Reggie was also malnourished, had a peculiar rash over his chest, a serious ear infection and had been exposed to tuberculosis.

Dr. Pielet identified colored photographs taken of Reggie before his burns were cleaned and debrided. The photographs show Reggie's naked body, and the sepia-colored areas of his skin stand in stark contrast to the burned, raw and pink-looking areas of his skin resulting from the severity of the burns.

According to Dr. Pielet, several characteristics of Reggie's burns indicate the injuries were not self-inflicted but resulted from someone dunking Reggie in a bathtub with hot water. Reggie's burns were consistent with a scalding water burn. Dr. Pielet observed a very sharp line of demarcation between the burned and unburned areas. He also noted that from the location of Reggie's burns it was apparent he was in a flexed position at the hip and knee, indicating that Reggie was withdrawing from a painful stimulus. There was a ring sign in the central region of Reggie's buttock signifying Reggie suffered more severe burns around the outside of his buttock as compared to the central region. In a bathtub containing hot water,

the bathtub's surface would be cooler than the water itself because solids such as steel or porcelain covering steel dissipate heat faster than water. A ring sign would result if a child were held in hot water in a bathtub with his buttock resting on the bathtub's surface because the burn would be less severe where the buttock was actually touching the bathtub. Reggie had only one splash mark burn on the back of his left calf. The lack of splash mark evidence indicated that Reggie did not fall into the burning substance. According to Dr. Pielet, "it would be impossible for a child to fall into a tub in that position and stay in that position to sustain that type of burn."

Dr. Pielet concluded that it was highly unlikely that Reggie's burns were accidental because "to sustain a burn in this distribution he would have had to be sitting, sitting with his feet up in the air and a child of two years of age would, most likely, not be, would not be able to sit in a tub and reach up and turn on a tap."

Upon administering treatment, Dr. Pielet noted that Reggie was relatively quiet and passive although a child of that age would usually be very scared by the strange surroundings and the treatments because the initial dressing changes and debridement are quite painful. This led Dr. Pielet to conclude that Reggie had been in an environment where he was scared.

Dr. Pielet examined Reggie on the date of trial. According to Dr. Pielet, Reggie's burns healed but have resulted in permanent scarring.

Pruitt relayed the following version of events at trial. On February 10, 1994, at approximately 12 p.m., she left Reggie in defendant's care while she took her daughter, Jade, for vaccinations. When Pruitt returned home defendant told her that Reggie defecated on himself so he put Reggie in the bathtub to wash him. Defendant then went to answer the telephone and told Reggie to turn the water off. Next, defendant heard Reggie crying so he rushed to him and saw that Reggie turned the cold water off. When defendant dried Reggie off, the skin on his buttocks began peeling off. Pruitt described the skin on Reggie's buttocks as pink and stated that it did not look normal.

Pruitt then purchased Benedine cream, peroxide and first aid spray to treat Reggie because she feared the Department of Children and Family Services (DCFS) would take him away from her if she sought professional medical treatment because DCFS already had four of her children. Defendant and Pruitt argued over Reggie, Pruitt said defendant wanted to take him to the hospital but she was scared of DCFS. Pruitt wanted to take Reggie to her niece's house but defendant would not allow her to leave.

The next morning, Pruitt telephoned her niece, Angela Kil-

patrick. At trial, Pruitt said she lied to Kilpatrick, saying that defendant scalded Reggie and she needed to take him to the hospital. Pruitt also asked Kilpatrick to call the police.

Kilpatrick picked up Pruitt and Jade, Reggie was still in the house with defendant. Pruitt asked Kilpatrick to let her run into the house to get Reggie, but Kilpatrick told her to wait until the police arrived. The women drove around the block and returned to find the police had arrived and were on the porch speaking with defendant. Defendant invited Pruitt, Kilpatrick and the police into the house. By the time Pruitt came back outside, defendant had been handcuffed. Pruitt stated that she spoke with Ann Head, an assistant State's Attorney, but everything she told Head was untrue. Pruitt stated that she visited defendant every other week since the offense occurred and that she asked an assistant State's Attorney to drop the charges.

Ann Head testified that on February 12, 1994, she was an assistant State's Attorney assigned to investigate an aggravated battery of a child. After speaking with Pruitt and with Pruitt's permission, Head recorded in summary form what she was told. After reviewing the document and making corrections, Head and Pruitt signed each page of the statement.

In the statement, Pruitt stated that on February 10, 1994, at 11:30 a.m. she took Jade to the doctor, leaving Reggie in defendant's care. When she returned home, defendant told her that Reggie defecated on himself so he put him in the shower. A customer came to the door so defendant left Reggie, telling him to turn the shower off. Defendant heard Reggie scream, he took him out of the shower, dried him off and noticed his skin peeling off. Pruitt said Reggie was burned on his buttocks and penis and the skin was pink and white. Defendant locked Pruitt and Reggie in the apartment and would not let Pruitt take Reggie to the hospital. Pruitt called her nieces and asked them to call the police.

Defense witnesses testified that defendant provided for Pruitt and her children and was never known to mistreat Pruitt's children or other people's children left in his care. The defense also presented testimony that Pruitt admitted she lied when she stated that defendant burned Reggie because the police told her if she lied she could get her children back and she was angry at defendant.

The jury found defendant guilty of heinous battery and aggravated battery of a child. Defendant filed a *pro se* motion for a new trial and subsequently filed a motion for a new trial with assistance of private counsel. The court advised defendant he would only consider the motion filed by counsel and denied the motion for a new trial.

■ Defendant first contends that his conviction for heinous battery must be reversed because the State failed to carry its burden of proof. We disagree. The heinous battery statute reads as follows:

> "A person who, in committing a battery, knowingly causes severe and permanent disability or disfigurement by means of a caustic substance commits heinous battery." 720 ILCS 5/12—4.1 (West 1992).

Defendant contends that the State failed to establish that Reggie suffered severe and permanent disfigurement. To reverse a conviction based on sufficiency of the evidence, the defendant must prove that the evidence against him is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt as to his guilt. The relevant inquiry for us on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Sutherland*, 155 Ill. 2d 1, 17, 610 N.E.2d 1, 8 (1992).

■ We find the evidence here sufficient to prove that Reggie suffered severe and permanent disfigurement. The record is replete with evidence establishing the severity of the burns Reggie suffered. The burns covered 10% of Reggie's body, including the buttocks, thighs, and tip and base of the penis. Reggie suffered second degree burns, which are known to be excruciatingly painful because they expose the victim's nerve endings. Testimonial and photographic evidence admitted at trial established that Reggie's burns were so severe they turned his sepia-colored skin pink and raw looking. Moreover, Reggie's wounds were so severe he was transferred from Roseland to the University of Chicago hospital so he could receive the specialized treatment necessitated by the seriousness of his injuries. Dr. Pielet, qualified as an expert in the fields of reconstructive and plastic surgery, with a specialty in burn management and burn reconstruction, stated in no uncertain terms that although Reggie's injuries healed he suffered permanent scarring.

A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses, and a court will not reverse a conviction unless the evidence is so improbable as to create a reasonable doubt of guilt. The jury specifically addressed the issue of severe and permanent disfigurement as directed by the instruction which read:

> "To sustain a charge of heinous battery, the State must prove the following propositions:
>
> *First Proposition*: That the defendant knowingly caused severe and permanent disfigurement to Reginald Pruitt."

We find that the evidence amply supports the jury's finding of severe and permanent disfigurement.

■ Next, defendant contends his convictions for heinous battery and aggravated battery of a child must be reversed because the State failed to prove defendant acted with the requisite *mens rea*. To sustain a conviction for heinous battery, the State must prove the defendant acted knowingly in the commission of the offense. 720 ILCS 5/12—4.3 (West 1992). A person commits the offense of aggravated battery of a child when he acts intentionally or knowingly during the commission of the offense. A person acts knowingly when he is consciously aware that a particular result is practically certain to result from his conduct. 720 ILCS 5/4—5 (West 1992).

■ We find the evidence sufficient to prove defendant guilty beyond a reasonable doubt. Dr. Pielet's expert testimony stated that it was highly unlikely Reggie sustained accidental burns. According to Dr. Pielet, "it would be impossible for a child to fall into a tub in that position and stay in that position to sustain that type of burn." Dr. Pielet also stated:

> "In order to sustain a burn in this distribution, he would have had to be sitting, sitting with his feet up in the air and a child of two years would not, most likely, not be, would not be able to sit in a tub and reach up and turn on a tap."

No contrary medical expert evidence was presented. Furthermore, Pruitt's testimony corroborating defendant's claim that the injury was accidental was impeached by her pretrial statements. The jury, as trier of fact, was charged with determining which evidence to believe. We find that the evidence supports the jury's finding that defendant's actions were knowingly committed.

■ While the jury returned guilty verdicts for both heinous battery and aggravated battery of a child, defendant was only sentenced for the heinous battery conviction. The trial court correctly found that defendant could not also be sentenced on the aggravated battery conviction because it is a lesser offense of heinous battery. See *People v. King*, 66 Ill. 2d 551, 363 N.E.2d 838 (1977). A sentence is the final judgment in a criminal case, and an appeal cannot be entertained absent the imposition of sentence. *People v. Turnipseed*, 274 Ill. App. 3d 527, 531, 653 N.E.2d 1258, 1260-61 (1995). This case is, however, properly before us on defendant's appeal of his conviction for heinous battery, and we are authorized under Rule 366 (134 Ill. 2d R. 366) to vacate the incomplete judgment entered on the aggravated battery of a child verdict. Accordingly, we vacate the judgment of conviction for the lesser offense of aggravated battery of a child.

Defendant next contends that he was denied a fair trial because the trial court abused its discretion in the manner in which it responded to a question posed by the jury during deliberations. Dur-

ing deliberations, the jury asked the trial court the following question: "To make the crime heinous does the intent have to occur at the time of the actual act or can the fact that no one reacted to the boy's injury make it heinous?" The court answered the jury, saying "refer to the two instructions dealing with heinous battery and resolve the question pursuant thereto."

A circuit court must instruct the jury where clarification is requested, the tendered instructions are incomplete and the jurors are manifestly confused. A trial court may decline to answer a jury's question if the court's answer would cause it to express an opinion that might direct the verdict or if the jury instructions are readily understandable and sufficiently explain the relevant law. *People v. Coleman*, 223 Ill. App. 3d 975, 1004, 586 N.E.2d 270, 290 (1991).

■ The trial court did not abuse its discretion in telling the jury to refer to the jury instructions, but, rather, the court properly considered the appropriate legal standards. Before giving the jury its answer, the trial court noted that it must be "very careful not to substitute its judgment for that of the jury, or create any inference or impression of what the court feels the answer should be." The trial court also found that the tendered instructions aptly state and define what the State must prove to sustain a charge for heinous battery. Those instructions read as follows:

> "A person commits the offense of heinous battery when he knowingly causes severe and permanent disfigurement to another by means of a caustic substance."

And:

> "To sustain a charge of heinous battery, the State
> must prove the following propositions:
> *First Proposition*: That the defendant knowingly caused severe and permanent disfigurement to Reginald Pruitt; and
> *Second Proposition*: That the defendant did so by means of a caustic substance.
> If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.
> If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

We find that the trial court did not abuse its discretion in answering the jury's question by referring the jury to the tendered instructions because those instructions were clear, the jury's request essentially sought an explanation of what satisfied the necessary mental state and the trial court did not want to influence the jury's

deliberations. See *People v. Jefferson*, 257 Ill. App. 3d 258, 268, 628 N.E.2d 925, 933 (1993).

■ Defendant next argues that the trial court abused its discretion in sentencing him to 30 years' imprisonment. We agree. While sentencing determinations of the trial court are entitled to substantial deference, a reviewing court has the power and authority to reduce a sentence imposed by the trial court where the trial court's decision constitutes an abuse of discretion. *People v. O'Neal*, 125 Ill. 2d 291, 297-98, 531 N.E.2d 366, 368 (1988). In sentencing a defendant, a trial court must balance the retributive and rehabilitative purposes of the punishment, taking into account both the seriousness of the offense and the objective of restoring the offender to useful citizenship. *People v. Hernandez*, 278 Ill. App. 3d 545, 555, 663 N.E.2d 86, 92 (1996).

Heinous battery is punishable by a sentence of not less than 6 years and not more than 30 years. 730 ILCS 5/5—8—1 (West 1992). After reviewing defendant's history, we conclude that a 30-year sentence in this case is excessive. We are appalled by the cruelty of defendant's conduct and in no way diminish the seriousness of his offense. As judges, however, we are required to ensure that a particular sentence is designed to further both retributive and rehabilitative ends. We find that the trial court did not properly balance the dual purposes of incarceration in this case. Consequently, we hereby reduce defendant's sentence to 15 years.

For the reasons stated, the judgment of conviction for heinous battery is affirmed as modified, and the judgment of conviction for aggravated battery of a child is vacated.

Affirmed as modified.

TULLY, P.J., concurs.

JUSTICE GREIMAN, concurring in part and dissenting in part:
I concur in the majority's holding that the trial court did not abuse its discretion in its response to the jury's inquiry. I respectfully dissent from the majority's decision to affirm defendant's conviction for heinous battery because I believe that the evidence of severe and permanent disfigurement was not sufficient to uphold such conviction based on *People v. O'Neal*, 257 Ill. App. 3d 490 (1993).

In *O'Neal*, this court reversed a conviction for heinous battery, finding that the State "offered no evidence of severe and permanent disfigurement" to the victim. *O'Neal*, 257 Ill. App. 3d at 494. The two-year-old victim in *O'Neal* sustained burns on his legs from just below his knees down to his feet when the defendant placed or held the

victim in a bathtub with hot water. The doctor testifying for the State classified the victim's injury "as a partial thickness scald burn or second degree burn." *O'Neal*, 257 Ill. App. 3d at 492. The partial thickness heated in 10 days. Although the majority of the skin surface remained intact, the "mechanical integrity" of the skin below its surface was "permanently altered." *O'Neal*, 257 Ill. App. 3d at 492. The victim's mother testified that the victim remained in the hospital for three weeks, had physical therapy for several months after leaving the hospital, and required home therapy treatment for a minimum of six months thereafter. The victim's mother also testified that the victim did not have any skin grafts or plastic surgery. *O'Neal*, 257 Ill. App. 3d at 491.

Like the doctor in *O'Neal*, Dr. Pielet testified that the victim sustained partial thickness burns, which are second degree burns, and "[o]nce it was determined that these burns would most likely heal without surgical intervention, we instituted local wound care." Reggie remained in the hospital for $3^1/_2$ weeks and Dr. Pielet testified that, upon discharge, Reggie "was healed." Moreover, Dr. Pielet testified that Reggie's "burns are completely healed. He does have scars. Of course, these scars are permanent."

I do not believe that existence of scars alone constitutes severe and permanent disability or disfigurement for purposes of the heinous battery statute. Unlike the instant circumstances, cases that have sustained heinous battery convictions present egregious situations and grievous disfigurement and disability. *E.g., People v. Hicks*, 101 Ill. 2d 366 (1984); *People v. Fomond*, 273 Ill. App. 3d 1053 (1995); *People v. Negrete*, 258 Ill. App. 3d 27 (1994); *People v. Rogers*, 222 Ill. App. 3d 774 (1991). In *Hicks*, the defendant poured boiling water over the nine-year-old female victim, causing severe burns on the victim's chest, abdomen and upper right arm, and requiring substantial debridement and skin grafting. In *Fomond*, a $2^1/_2$-year-old girl sustained third-degree burns that required at least seven surgeries, including two skin grafts and continued physical therapy even several years after receiving the burns. In *Negrete*, a 17-month-old baby boy sustained burns from hot water, resulting in permanent scarring across 60% of his body and, due to the burning of his genital area, possible permanent damage to his reproductive capacity. In *Rogers*, the defendant poured grain alcohol on top of the female victim's head and then threw a lit match at her, causing her head, face, chest and pants to ignite.

In light of the above-cited case law, I would reverse defendant's conviction for heinous battery.

Defendant was properly convicted of aggravated battery against

a child; however, no sentence was imposed for that crime. If a reviewing court reverses a conviction on which the sentence was imposed, it can remand for sentencing on a conviction on which no sentence was imposed. Such process has been approved in *People v. Dixon*, 91 Ill. 2d 346 (1982), and *People v. Frantz*, 150 Ill. App. 3d 296, 300 (1986) ("[i]f the reviewing court acts to affirm the incomplete judgment of conviction, the reviewing court then must remand the cause for imposition of sentence").