NOTICE
Decision filed 04/24/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 241217-U

NOS. 5-24-1217, 5-24-1222, 5-24-1228 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | Nos. 20-CF-742, 21-CF-1071, |
| | ) | 21-CF-1520 |
| PRINTISS V. TURNER, | ) | |
| | ) | Honorable Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOLLINGER delivered the judgment of the court.
Justices Vaughan and Hackett concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's sentence where the circuit court properly weighed and considered aggravating and mitigating factors.

¶ 2    Defendant Prentiss V. Turner entered a plea of guilty in three separate cases to two counts of aggravated unlawful use of a weapon and one count of aggravated battery with a firearm. He was subsequently sentenced to a cumulative term of 26 years of incarceration. On appeal, he contends that the circuit court did not consider, as a mitigating factor, his potential for rehabilitation. For the reasons that follow, we disagree and affirm the circuit court's sentence.

¶ 3                                 I. BACKGROUND

¶ 4    On July 8, 2020, defendant Prentiss V. Turner was charged by information with four counts of aggravated unlawful use of a weapon (720 ILCS 5/24-16(a)(1), (a)(3)(C), and (a)(3)(A) (West

1

2018)), in Champaign County case No. 2020-CF-742 (case 742). The charges alleged that on July 8, 2020, defendant was carrying in a vehicle, without a valid Firearm Owner's Identification (FOID) Card, a Ruger 9-millimeter handgun, a Taurus G2c 9-millimeter handgun, a Sig Sauer 9-millimeter SP 2022 handgun, and a SCCY CPX2 9-millimeter handgun, while he was not on his own land with the firearms uncased, loaded, and immediately accessible.

¶ 5       On September 9, 2021, defendant was charged by information with four counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2020)) in relation to an incident that occurred on October 8, 2020, in Champaign County case No. 2021-CF-1071 (case 1071). It was alleged that on that date, defendant discharged a firearm that caused the death of Martini Morrow. The charges carried a mandatory 20-60 years' imprisonment with an additional mandatory 25-year firearm enhancement. (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2018)).

¶ 6       On December 14, 2021, defendant was charged by information with one count of aggravated unlawful use of a weapon (720 ILCS 5/24-16(a)(1), (a)(3)(C), (a)(3)(A) (West 2020)) in relation to an incident that occurred on July 4, 2021, in Champaign County case No. 2021-CF-1520 (case 1520). The charge alleged that on July 4, 2021, defendant carried a firearm uncased and loaded in a vehicle without a valid FOID card.

¶ 7       On August 1, 2024, defendant was duly advised of his rights and entered into an open plea concerning all three cases. He pled guilty in case 742 to one count of aggravated unlawful use of a weapon (Class 4) in relation to the black Ruger 9-millimeter handgun, and in case 1520 to aggravated unlawful use of a weapon (Class 4). In case 1071, on the same date, the State filed a charge of a Class X felony for aggravated battery with a firearm resulting in bodily harm to Morrow, to which defendant pled guilty. Defendant was informed that the available sentence range for this charge was 6 to 30 years' incarceration, without the possibility of probation.

2

¶ 8    A sentencing hearing was held on September 13, 2024. The State called Officer Sebestik, a patrol sergeant with the Champaign Police Department, first. He testified concerning an incident on June 18, 2020, during which law enforcement officers responded to a domestic battery incident involving Briah Harris-Howard, who stated that she was in a dating relationship with defendant. Harris-Howard reported that on that date, defendant texted her, expressing a desire to see his child. Later that evening, she heard a knock at her door and, unable to see through the peephole, attempted to observe who was outside by opening the door slightly. When she tried to peer through a crack in her door, defendant forcefully entered the apartment and hurried past her to an upstairs bedroom, attempting to locate his child, who was not present. Harris-Howard confronted defendant in the upstairs bedroom. Defendant pushed her onto a bed, causing her to fall onto a drawer extending from the bed. She recovered from the fall, and they resumed arguing near the staircase. Harris-Howard instructed defendant to leave, but he pushed her down the staircase. She indicated that she slid headfirst down the stairs on her back, after which defendant fled the premises. A witness corroborated the account of this incident. Sergeant Sudeski testified that during defendant's interview about the incident, defendant was unclear about whether he forcibly entered the apartment. However, defendant did state that "he grabbed her and sat her down."

¶ 9    Officer Cory Christensen of the Champaign County Sheriff's Office provided testimony regarding an incident that occurred on the evening of July 8, 2020. During that evening, he conducted a traffic stop in Urbana, which involved defendant and three other individuals. All occupants of the vehicle were subsequently removed, and defendant admitted to smoking cannabis. A K9 search was performed on the vehicle, and defendant was frisked for officer safety. During the search, a black Ruger 9-millimeter pistol was discovered on defendant's person, located near his groin area. The firearm was loaded with 12 bullets, including one in the chamber, and its serial

number had been scratched off. Additionally, other firearms were found within the vehicle, specifically a Taurus G2C 9-millimeter, a pink SCCY CP-X2 9-millimeter, and a Sig Sauer SP2022 9-millimeter. (These were the facts regarding case 742).

¶ 10 Detective Stephen Vogel of the Champaign Police Department testified next. He was assigned as the lead detective concerning the murder of Morrow, with defendant identified as one of the suspects, along with Amari Robinson. Detective Vogel explained that on the evening in question, a gathering took place at Morrow's girlfriend's residence, with several individuals present, including defendant and Robinson. During the course of that evening, Robinson and some others asked Morrow to "go hit a lick with them, a/k/a robbery or home invasion." Although Morrow was hesitant initially, he ultimately acquiesced. The group, which included Morrow, Robinson, and defendant, walked a short distance from the initial gathering location, where Morrow was eventually shot multiple times. The firearms used included a 9-millimeter and a .45-caliber weapon; the 9-millimeter was later attributed to Robinson. During the processing of the scene, a sock was recovered and submitted to the crime laboratory for DNA analysis; both defendant's DNA and gunshot residue were detected on the sock. Detective Vogel testified that he believed the sock was on defendant's hand, noting that Morrow was discovered with socks on his hands and that the suspects utilized socks on their hands for the robbery. Defendant and Robinson fled the scene together.

¶ 11 Prior to the incident, the electronic devices belonging to defendant and Robinson were powered off and subsequently activated shortly after the incident, appearing approximately half a mile from the scene. A friend of defendant's mother stated that defendant and Robinson arrived at her home and defendant asked if her son was present, to which she responded no. She asked about the purpose of defendant's visit, and he explained that they had just left a party and were seeking

4

transportation. Defendant requested that she call a Lyft, which she subsequently did. While inside her residence, the individual heard sirens and asked defendant and Robinson whether the sirens were directed at them; both said no. The Lyft arrived and transported defendant to a location where he was staying with an Urbana teacher.

¶ 12 Detective Vogel spoke with the teacher, who stated that defendant requested her to watch his daughter while he went out. Detective Vogel further testified that efforts to arrest defendant at the courthouse were unsuccessful; he escaped through a stairwell and evaded apprehension. Ultimately, the U.S. Marshals tracked him to Atlanta, Georgia, where he was arrested several months later.

¶ 13 Detective Vogel testified regarding jail calls from defendant while defendant was in custody. Detective Vogel listened to a conversation between defendant and another inmate, both housed in Kankakee. Defendant instructed the other individual to call that person's sister and told her to get a pen and paper to write down verbatim what he would say. He told her to call a specific telephone number, which belonged to defendant's mother, and to instruct her to have defendant's brother contact the State to seek immunity, and to claim ownership of the firearm. In a subsequent phone call, defendant spoke with his mother, who confirmed receipt of the call. During an additional call, he and defendant's mother referred to defendant's brother as "little man," and she mentioned, "loose lips sink ships." The phone calls were played for the circuit court.

¶ 14 Detective Vogel testified that defendant is affiliated with the local gang GTB, Get the Band. Detective Vogel examined defendant's social media accounts and discovered multiple videos depicting him with various firearms, including guns and rifles. These videos were presented to the circuit court. In one of the videos, defendant was wearing a hat adorned with a blue star, which is associated with the Gangster Disciples.

5

¶ 15 Detective Vogel testified that the .45-caliber firearm used to kill Morrow was attributed to defendant. A .45-caliber weapon was stolen from Rantoul and was either sold to or stolen by defendant's other brother, Nehemiah Campbell. Subsequently, defendant and another brother, Amario, possessed this firearm at various times. When questioned by the circuit court, Detective Vogel stated that, in the videos, defendant was holding handguns and black rifles.

¶ 16 During cross-examination, Detective Vogel detailed a longstanding feud between the Morrow and Robinson families, with the Robinson family attributing the death of Robinson's brother to the Morrows. However, Detective Vogel did not establish a comparable relationship between defendant's family and the Morrow family. The 9-millimeter firearm used in Morrow's death was traced to Robinson and associated incidents in Joliet involving Robinson. Detective Vogel further testified that Morrow had 14 entrance wounds, 12 of which were inflicted by a 9-millimeter firearm, and two by a .45-caliber firearm.

¶ 17 Detective Ken Sprague of the Urbana Police Department testified next. He discussed an incident that occurred on July 4, 2021, during which a firearm was recovered in Urbana following a hit-and-run accident. A white Charger, exceeding the speed limit, attempted to overtake another vehicle. The Charger was traveling at such a high speed that when the driver attempted to re-enter the lane after overtaking, it overturned. The driver of the Charger exited the vehicle and fled the scene. Later, defendant's sister appeared at the scene, and a loaded Glock 43X was discovered inside the vehicle. The vehicle was registered to defendant's mother, who was subsequently interviewed. She informed Detective Sprague that the only individual who could have been operating the vehicle was defendant, as she had permitted him to borrow it. The Glock firearm was forwarded to the Illinois State Police Crime Laboratory for DNA analysis, which confirmed that

6

defendant contributed to the DNA found on the weapon. (These were the facts relating to case 1520).

¶ 18    Detective Sprague testified that defendant was associated with the gang GTB, "which is Getting the Bands, meaning money." Through his investigations into violence and GTB, he discovered that defendant had some affiliations with this gang. This concluded the State's evidence.

¶ 19    Defendant submitted 18 letters written on his behalf, along with a transcript of course credits obtained while incarcerated, as mitigation. During closing arguments, the State requested that defendant be sentenced to 33 years in the Illinois Department of Corrections, while defendant advocated for a 10-year sentence.

¶ 20    Defendant made a statement in allocution, expressing remorse and requesting an opportunity to reunite with his family in order to assist in raising his children. He acknowledged making a poor decision that he would have to live with for the rest of his life. Defendant outlined plans to relocate his grandmother and children to Georgia and to acquire a commercial driver's license. He extended his apologies to Morrow's family, noting that he was young at the time and lacked better judgment.

¶ 21    In its pronouncement of the decision, the circuit court indicated that it considered the presentence investigation report, the evidence presented, the arguments of counsel, and defendant's statement. It stated that it considered all statutory and non-statutory factors in aggravation and mitigation, whether explicitly mentioned or not. The circuit court noted that defendant pled guilty, took responsibility for his actions, and expressed remorse by apologizing to the family. The circuit court observed that defendant was young, at the age of 22, and had three young children. It noted that one of the mothers of his children obtained an order of protection

7

against defendant; however, defendant maintained regular contact with two of his three children. The circuit court discussed defendant's difficult upbringing, which involved familial abuse, substance abuse, and alcohol issues. Defendant obtained his high school diploma while in the Department of Juvenile Justice. The circuit court also acknowledged defendant's alcohol and drug use, noting he has not been successful in any form of treatment. Additionally, the circuit court considered the letters submitted on defendant's behalf.

¶ 22    Regarding aggravation, the circuit court noted the necessity of conveying a deterrent message. Additionally, defendant's criminal history was taken into account, including juvenile cases at ages 13 and 17, both resulting in a sentence of seven years. Defendant was released in 2020, subsequent to which these events transpired. The circuit court indicated that juvenile detention did not rehabilitate defendant. The circuit court also discussed defendant's gang affiliation, his previous cases, and the facts pertaining to the current cases.

¶ 23    Regarding the present matter, the circuit court acknowledged that Robinson was the "main actor" and that defendant "went along for the ride." It referenced the sock discovered with defendant's DNA and gunshot residue, suggesting that defendant was an active participant. Additionally, the circuit court discussed the photographs and videos of defendant, noting that the content disturbed the circuit court. It stated:

> "This is a young man who had a rough start in life. had a rough upbringing. Most of his family and friends are in prison or members of gangs. This is what he learned is normal for him. And I feel badly for him that there was no mentor in his life to say you can't keep doing this, you're gonna end up just like your dad, you're gonna end up just like your brother.

But he has a history of violence, of being around guns. He's essentially been a one-man crime wave on all of these kinds of cases."

¶ 24 The circuit court sentenced defendant to a term of 22 years of incarceration in case 1071, 2 years of incarceration in case 742, and 2 years of incarceration in case 1520, with all sentences to be served consecutively for a total of 26 years. Subsequently, defendant filed a motion for reconsideration, contending that the sentence was excessive and that the circuit court placed undue emphasis on deterrence and defendant's criminal record. Defendant further asserted that the circuit court insufficiently considered his potential for rehabilitation, his age, and his family background. At the hearing on the motion to reconsider, defendant stood on his motion. The circuit court denied the motion. This appeal ensued.

¶ 25                                                   II. ANALYSIS

¶ 26 On appeal, defendant asserts that the sentence was excessive "given the compelling mitigating evidence demonstrating his rehabilitative potential." He contends that the circuit court did not consider his youth at the time of the offense and argues that "his brain development impacted his decision making." He asserts that his accountability and remorse were critical mitigating factors that the circuit court failed to consider. Furthermore, he asserts that his potential for rehabilitation is enhanced by his social support, evidenced by 18 letters from friends and family who are dedicated "to supporting [defendant] once he returns to society." Additionally, defendant states that he completed 32 hours of coursework following his arrest, and he argues that this achievement was not considered during sentencing. He requests that his sentence be reduced or in the alternative, that the matter be remanded for a new sentencing hearing.

¶ 27 In response, the State asserts that the circuit court properly considered and weighed all mitigating and aggravating factors. The State contends that defendant's argument, claiming that

the circuit court did not consider his rehabilitative potential, is refuted by the record. It emphasizes that the circuit court acknowledged consideration of defendant's age and rehabilitative potential "noting that it was only when defendant was incarcerated that defendant stopped committing crimes." Furthermore, the State emphasizes that the circuit court outlined all factors taken into account in determining defendant's sentence. It also points out that the circuit court could have imposed a sentence of 36 years but elected to impose only 26 years, asserting that when a sentence is within the statutorily-prescribed range, there exists a presumption that the sentence is neither arbitrary nor excessive, citing *People v. Weiser*, 2013 IL App (5th) 120055.

¶ 28    The Illinois Constitution of 1970, article I, section 11, requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "A sentencing court must not only consider rehabilitative factors in imposing a sentence, it must also make rehabilitation an objective of the sentence." *People v. Wendt*, 163 Ill. 2d 346, 352-53 (1994). In fashioning an appropriate sentence, the trial court must consider defendant's "credibility, demeanor, general moral character, mentality, social environment, habits, and age" and impose a sentence based on the circumstances of each case. *People v. Pina*, 2019 IL App (4th) 170614, ¶ 19 (quoting *People v. Fern*, 189 Ill. 2d 48, 53 (1999)). The court must also carefully consider the statutory factors in mitigation and aggravation. *People v. Center*, 198 Ill. App. 3d 1025, 1033 (1990). The court is not, however, required to recite and assign a value to each factor considered. *Pina*, 2019 IL App (4th) 170614, ¶ 19.

¶ 29    A trial court's sentencing decision is entitled to great deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Such deference is granted "because the trial court is generally in a better position than the reviewing court to determine the appropriate sentence." *Id.* "If a sentence falls

within the statutory limits, it will not be overturned on appeal absent an abuse of discretion." *People v. Bunning*, 2018 IL App (5th) 150114, ¶ 16. "An abuse of discretion occurs only if a sentence greatly varies from the spirit and purpose of the law or where it is manifestly disproportionate to the nature of the offense." *Id.* "In exercising its discretion, a trial court must consider all relevant factors in mitigation." (Emphasis omitted.) *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 31; 730 ILCS 5/5-5-3.1(a) (West 2020) (providing that the statutory factors in mitigation "shall be accorded weight."). "If the record contains evidence of mitigating factors, we presume that the court considered this evidence unless there is 'some indication, other than the sentence imposed, to the contrary.' " *Weiser*, 2013 IL App (5th) 120055, ¶ 31 (quoting *People v. Tye*, 323 Ill. App. 3d 872, 890 (2001)). Here, the maximum sentence for defendant was 36 years' incarceration.

¶ 30    Defendant asserts that the circuit court failed to consider his rehabilitative potential, citing factors such as his youth, upbringing, accountability, remorse, social history, and academic coursework. We disagree. The circuit court must " 'balance the retributive and rehabilitative purposes of the punishment.' " *Id*. ¶ 32 (quoting *People v. Cooper*, 283 Ill. App. 3d 86, 95 (1996)). This balancing requires the circuit court to consider both the seriousness of defendant's offense along with his potential for rehabilitation. *Id.* "However, the court is not required to give more weight to the defendant's potential for rehabilitation than it gives to aggravating factors, such as the seriousness of the offense. The seriousness of the offense is one of the most important factors for the court to consider." *Id.*

¶ 31    In pronouncing its sentence, the circuit court stated that it considered the presentence investigation report (report) and all of the evidence presented. The report detailed defendant's criminal history and social background. The report noted that defendant's father was abusive and

11

incarcerated for the majority of defendant's life. The report pointed out that defendant obtained his high school diploma while confined within the Illinois Department of Juvenile Justice (IDJJ) in 2020. The report further stated:

> "Upon completion of the interview, Mr. Turner was asked what he felt is the major problem in his life, he replied, 'I was hanging around the wrong crowds. Was young and dumb. I didn't know what I was living for.' He was then asked what he has done or what he is willing to do to address the problem, he stated, 'I've been going to school again for college courses and writing down my goals I'm changing my environment.' Next, he was questioned how he felt about criminal behavior, to which he answered, 'I mean. I don't really know I know it's wrong. All criminal behavior is wrong' Lastly, Mr. Turner was asked how he felt about his present offenses and upcoming sentencings. to which he commented, 'I feel regret and remorse I want to apologize.' "

By reviewing the contents of the report, the circuit court considered defendant's rehabilitative potential.

¶ 32    Furthermore, the circuit court expressly took into account mitigating factors, including the rehabilitation of defendant. It stated that it considered the "character of the Defendant, with the objective of restoring him to useful citizenship." Additionally, it acknowledged awareness of other statutes that could be considered "when an individual who is younger in age commits offenses," and noted that, although they are not "completely applicable," these factors were nevertheless considered. Contrary to defendant's argument on appeal, the circuit court observed that defendant accepted responsibility for his actions and stated, "under the law, I must consider that as a mitigating factor." It also highlighted defendant's remorse and his act of apologizing to the victim's family. Furthermore, the circuit court remarked that defendant was a "young man at age

12

22" and had experienced a difficult upbringing, discussing the environment in which he was raised. The circuit court noted that defendant obtained his high school diploma and also engaged in coursework while in custody on these charges, demonstrating "some commitment to rehabilitative potential." As such, defendant's assertion on appeal that the circuit court "failed to adequately consider several compelling mitigating factors at sentencing, including [defendant's] youth, upbringing, accountability, remorse, social history, and coursework," is simply unsupported by the record.

¶ 33    "Though the court must consider the defendant's rehabilitative potential in sentencing him, such consideration need not outweigh the seriousness of the offense or other aggravating factors." *People v. Bolden*, 210 Ill. App. 3d 940, 949 (1991). In this instance, the circuit court considered defendant's youth, upbringing, accountability, remorse, social history, and coursework, and balanced these factors against others. For example, defendant, given his age, possessed an extensive criminal record, which progressed from disorderly conduct in 2013 to arson in 2014, then to attempted residential burglary in 2019. Evidence demonstrated that in 2020, after his release from IDJJ, defendant was involved in an incident of domestic violence, followed by the occurrences relevant to the present matter. Defendant was detained during a traffic stop, at which time a black Ruger 9-millimeter firearm was recovered from his person. In 2021, a vehicle registered to defendant's mother was involved in a hit-and-run incident, during which a loaded Glock 43X firearm was recovered. It was established that defendant was the sole individual capable of operating the vehicle, as his mother stated that she had provided him permission, and he was identified as a contributor to the DNA present on the firearm. Additionally, defendant was involved in the death of Morrow, having shot Morrow twice with his firearm. Finally, defendant

13

was affiliated with gangs, fled Illinois following the murder of Morrow, and was subsequently located by U.S. Marshals several months later in Georgia.

¶ 34　The circuit court expressly and adequately considered defendant's rehabilitation prospects and weighed them against the factors in aggravation, and found that it was outweighed by the seriousness of the offense. "Rehabilitation is not the only goal, but dual consideration is given to the seriousness of the offense and the rehabilitation of the offender." *People v. Elston*, 222 Ill. App. 3d 956, 960 (1991). While the total sentence was in the upper half of the statutory range for the offenses, it was 10 years below the maximum sentence. In light of the circumstances we discussed, we do not find this sentence excessive and do not find any abuse of the circuit court's discretion.

¶ 35　　　　　　　　　　　　III. CONCLUSION

¶ 36　For the foregoing reasons, we affirm the sentence imposed by the Champaign County circuit court.


¶ 37　Affirmed.