2018 IL App (1st) 162304

No. 1-16-2304

Opinion filed on December 4, 2018.

Second Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 8640 |
| | ) | |
| DAVID LUNDY, | ) | The Honorable |
| | ) | Mary Margaret Brosnahan, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Mason concurred in the judgment and opinion.
Justice Hyman dissented, with opinion.

**OPINION**

¶ 1    Following a bench trial, defendant, David Lundy, was convicted of armed robbery and sentenced to 10 years in prison. On appeal, defendant contends that 10 years is an excessive sentence where he was a homeless addict who stole $33 worth of underclothes. For the reasons that follow, we affirm.

¶ 2                                BACKGROUND

¶ 3     Defendant's conviction arose from an incident on May 17, 2015, at a dollar store in Chicago. Following his arrest, defendant was charged with one count of armed robbery.

¶ 4     At trial, Patricia Parker testified that about 11:30 a.m. on the day in question, she was working the aisles at the dollar store when she saw a man, identified in court as defendant, enter the front doors. Parker noticed defendant because of his "incognito look" on a warm day: baggy black pants, a baggy black jacket, and a hat pulled low on his face. Defendant walked toward the back of the store, and Parker lost sight of him for a few minutes because she was interrupted by a customer. When she spotted defendant again, he was moving from the clothing aisle to the underwear aisle with his back to her. Parker, who was at the other end of the aisle, saw defendant make what she described as a "gesturing motion" as though he was fiddling with something with his arms. In court, Parker mimed the gesture by moving her right arm up and toward her center.

¶ 5     Parker testified that defendant began walking toward her. She addressed him, asking whether he had anything on him, and if he did, to please give it to her and exit the store. Defendant looked confused and handed Parker a package of T-shirts. Because defendant's stomach area still looked baggy, Parker suspected he had additional items in his jacket. So, she asked defendant if he had anything else and again requested that if he did to please give her the rest of the merchandise. Defendant became upset and said he did not "have shit." Although Parker did not recall her exact words to defendant at this point, she testified that she told him something to the effect of, "I saw you stuffing something inside your clothing and I would really like for the rest of the items. It is not a big deal."

¶ 6     Defendant got upset, cursed at Parker, pulled out a red pocketknife with his right hand, and flicked it open. While extending the knife toward Parker, defendant said something like "I'm

not gonna give you shit," or "get the fuck out of my face." Parker turned to move away and called out for the assistant manager, Lakesha Phillips, who was behind the cash register. Phillips came over, and Parker told her defendant had pulled a knife on her because she caught him stealing. The three of them then walked together past the cash registers to the door. When asked whether defendant was saying anything at that point, Parker answered, "Yes, he was. He actually said, 'I don't have anything. What you gone [*sic*] do. I will kill you motherfuckers with this knife. You know what I am saying?' Just being — to me it was not that upsetting for a small woman like me." After cursing some more, defendant left the store.

¶ 7 While Parker was still at the front doors, she saw a police car in the street. She ran out of the store and toward the police car, waving and yelling that a man had pulled a knife on her. That police car did not stop, but a second police car behind it at a traffic light saw her and responded. Parker saw defendant running eastward, so she pointed the police in that direction. The police drove off in the direction Parker indicated and returned a short time later with defendant. Parker identified him as the man who had threatened her and pulled a knife on her. The police gave Parker a pack of boys' T-shirts, two packs of men's T-shirts, and a pack of men's underwear.

¶ 8 Finally, Parker identified the knife in question and viewed a series of video clips from store security cameras. She described what was depicted in each clip: (1) defendant walking into the store; (2) defendant and Parker on either ends of an aisle; (3) the "cash wrap" area of the store after Parker interacted with defendant; (4) defendant, Parker, and Phillips at the store exit; (5) defendant exiting the store with a red pocketknife in his right hand; and (6) Parker in the parking lot, waving her hands at a police car.

¶ 9      On cross-examination, Parker agreed that none of the video clips showed defendant threatening her with a knife. She said that defendant did not "point" the knife at her, but rather, pulled it out, flicked it open, and threatened her with it. She also stated that defendant was yelling and not calm when he made the threats. Parker reiterated that defendant displayed his knife to her prior to walking past the "cash wrap" area and stated that she never saw him put the knife away. Parker denied telling the police that defendant ran past the last point of purchase and displayed a knife as she chased him outside.

¶ 10      Lakesha Phillips testified that about 11:30 a.m. on the day in question, she was working at a cash register when Parker, who was on the sales floor, called out to her, said someone was shoplifting, and indicated it was defendant, whom Phillips identified in court. Phillips ran out from behind the counter. Defendant was being "loud" toward Parker and told Phillips, "I will kick your fucking ass." Phillips, Parker, and defendant exited the store. Phillips saw Parker flag down the police. The police pursued defendant and then returned with him a short time later. They gave Phillips a package of boys' T-shirts, two packages of men's T-shirts, and one package of underwear. Phillips scanned the items and created a receipt showing the subtotal for all four items was $33.25.

¶ 11      On cross-examination, Phillips acknowledged that she did not see defendant threatening Parker with a knife. She also did not see him carrying a knife in the store aisles or as he exited the store, but explained, "I didn't actually look at his hands and stuff." Phillips agreed that she told the police she never saw a knife. She also admitted that she filled out a store incident report but, since the date of the incident, had been unable to locate it.

¶ 12    Chicago police officer Brian Sherman testified that about 11:40 a.m. on the date in question, he and his partner, Officer Sandoval, were driving a marked police vehicle when they were flagged down by a dollar store employee who informed them a man had just taken merchandise from the store and displayed a knife. She pointed out a man who was running eastbound, and the officers gave chase. Eventually, Sherman got out of the vehicle and caught up to the man, identified in court as defendant, in a post office. Defendant was standing behind a pallet or a skid, and there were three packages of T-shirts and a package of underwear on the floor. Sherman detained defendant and recovered the items from the floor. When he performed a protective pat-down on defendant, Sherman found a red box cutter knife in his pants pocket. Sherman and his partner brought defendant back to the dollar store, where Parker identified him as the man who displayed a knife to her and took items from the store. The officers also brought the packages of T-shirts and underwear to the store, and they were identified by store employees as having been taken from the store.

¶ 13    On cross-examination, Sherman acknowledged that the original case incident report, which he did not prepare, indicated in its narrative section that Parker related she chased defendant out of the store, and he then displayed a knife.

¶ 14    Defendant made a motion for a directed finding, which the trial court denied. Following closing arguments, the trial court found defendant guilty of armed robbery. In the course of doing so, the trial court described the box cutter/knife for the record, stating that it was made of a "very heavy metal" by a company called Husky, was 4½ inches long when folded, 6 inches long when the switch was activated to release the blade, and very easy to open. The court also noted

that it seemed to be the policy of the store not to arrest shoplifters, but rather, "just to get the merchandise back and let him go and not even involve the police."

¶ 15     Defendant filed a motion for a new trial. At the conclusion of the hearing on that motion, the trial court again addressed the store's apparent policy with respect to shoplifters, stating that it was reasonable to infer from Parker's testimony that the store was not going to call the police, but that once defendant produced the box cutter, he escalated the situation and "things went the way they did." The trial court denied defendant's posttrial motion.

¶ 16     At sentencing, the State argued in aggravation that there were many people in the store when defendant robbed it, and that those people could have been injured by defendant and his weapon. The State also emphasized that defendant had 10 prior felony convictions, all reflected in the presentence investigation (PSI) report: a 2012 conviction for Class 4 possession of a controlled substance, a 2009 conviction for Class 3 theft, a 2005 conviction for Class 3 theft, a 2004 conviction for Class 4 retail theft, a 2000 conviction for a Class 2 drug offense, a 1992 conviction for Class 2 robbery, a 1992 conviction for aggravated battery/great bodily harm, a 1989 conviction of Class 2 robbery, a 1988 conviction of Class 2 robbery, and a 1988 conviction of Class 2 robbery. Based on this criminal history, the State observed that defendant would have to receive a Class X sentence even if he had been found guilty of robbery, as opposed to armed robbery. The State argued that based on defendant's extensive background and the nature of the offense, a minimum sentence would not be appropriate.

¶ 17     In mitigation, defense counsel argued that defendant was 50 years old and homeless and that the aggravated battery in his background was committed over 20 years ago. Counsel asserted that defendant is a drug addict, and that many, if not all, of his convictions revolved around

drugs, whether selling them to support his own habit or stealing other items to trade or sell for drugs or drug money. Counsel further argued that defendant did not use the box cutter to attempt to obtain merchandise from the dollar store, but rather, used it only "in an effort to make good on his escape." Finally, counsel emphasized that defendant had been respectful throughout the court proceedings, had completed the "WestCare" program while in jail,[1] and had been working in jail in the janitorial/sanitation department. Based on the nature of the crime and defendant's "certain remorse," defense counsel asked the court to impose a sentence close to the minimum.

¶ 18    In allocution, defendant stated he wanted to apologize to anyone he had offended, including the dollar store employees, his family, and the court. He admitted he was shoplifting, which was dumb, stupid, and a "bad decision." Defendant stated that he had a drug addiction, thanked the court for allowing him to participate in WestCare, and reported that he had served his time in jail constructively. Defendant told the court he needs help and asked for "some type of treatment."

¶ 19    The trial court addressed defense counsel's argument that defendant only used the box cutter to escape, observing that although defendant did not brandish a weapon upon entering the store or at the time he took and secreted the packages of T-shirts and underwear, the robbery was still occurring when Parker confronted him and he pulled out the box cutter. The court stated that it had considered the testimony, the PSI report, and all the statutory factors in aggravation and mitigation. In particular, the court noted in mitigation that no one was injured, that defendant wants to change his life, and that he completed the WestCare program in jail. In aggravation, the

---

[1]According to paperwork included in the common law record, "WestCare" is a treatment program that includes comprehensive and holistic substance abuse and mental health treatment through cognitive behavioral therapy and case management services.

court focused on defendant's 10 prior felony convictions, noting that they included a significant number of robberies. While acknowledging that some of the robberies took place long ago, the court commented, "[Y]ou have to take into account the amount of time that's spent in the penitentiary, and pretty shortly after you get out of the penitentiary, along comes another case." The court then ran through the timeline of prior convictions relative to defendant's various release dates from prison in detail, concluding, "So while there's been a long time that's passed from the original robberies in 1988, a long time ago, I'm considering the almost unremitting nature of the revolving door[.] *** And whatever has been going on, it hasn't caused any change in you." Again noting that defendant's criminal history included 10 felony convictions, the court stated that neither the minimum sentence nor a near-minimum sentence would be appropriate. At the same time, the court indicated that given the various factors in mitigation and its review of the PSI report, a sentence of 30 years would also not be appropriate. The court imposed a sentence of 10 years.

¶ 20    Defendant filed a motion to reconsider sentence, which he did not argue. The trial court denied the motion. This appeal followed.

¶ 21                                ANALYSIS

¶ 22    On appeal, defendant contends that a 10-year sentence is excessive for a homeless addict who stole $33 worth of underclothes from a dollar store. He asserts that his conviction was based on the "minimum conduct required to establish armed robbery [in that] he flashed a box cutter at a store employee after he had already taken merchandise off a shelf and was trying to leave the store" and argues that Parker even testified that his "flashing of the box cutter was 'not very upsetting.' " Defendant argues that instead of focusing on the minimal nature of the facts of the

case, the trial court focused on his prior convictions "without acknowledging that [his] prior convictions are a product of his social conditions — his longtime struggles with addiction and homelessness." He further argues that the trial court dismissed his rehabilitative potential by minimizing his expressions of remorse and his successful and ongoing participation in substance abuse treatment. Defendant asserts that the 10-year sentence does not reflect adequate consideration of his struggles with addiction; his demonstrated, ongoing rehabilitation; or an appropriate balancing of rehabilitation and retribution. As relief, defendant asks this court to reduce his sentence to the six-year statutory minimum or to remand for resentencing.

¶ 23    Sentencing decisions are entitled to great deference on appeal because the trial court is in a superior position to fashion an appropriate sentence based on firsthand consideration of relevant sentencing factors, including the defendant's credibility, demeanor, moral character, mentality, social environment, habits, and age. *People v. Fern*, 189 Ill. 2d 48, 53 (1999). We will not disturb a sentencing determination absent an abuse of discretion. *People v. Hauschild*, 226 Ill. 2d 63, 90 (2007). Sentences within the permissible statutory range may be deemed the result of an abuse of discretion only where they are "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000).

¶ 24    The record in the instant case indicates that the trial court was well aware of the mitigating factors defendant has identified on appeal. Defendant's history of addiction and homelessness and his participation in the WestCare program were not only included in the PSI report but also highlighted by defense counsel at sentencing. Counsel also asserted at sentencing that many, if not all, of defendant's prior convictions came about due to his drug addictions,

reported to the trial court that defendant had been nothing but respectful during the court proceedings, and noted defendant's remorse for his crime. Where mitigating evidence has been presented, it is presumed that the trial court considered it. *People v. Sven*, 365 Ill. App. 3d 226, 242 (2006). Here, the trial court acknowledged that no one was injured, that defendant had expressed remorse, and that the robberies in his criminal history had occurred long ago, and weighed those mitigating factors against the sheer number of defendant's prior convictions and the "revolving door" nature of his recidivism each time he was released from custody. Determining that neither a minimum (6-year), near-minimum, nor a maximum (30-year) sentence would be appropriate, the court fashioned a sentence of 10 years. In our view, this sentence is not "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210.

¶ 25    The dissent would have us reduce defendant's sentence to the minimum, in order to "match or reflect" the seriousness of the offense. Our colleague views the armed robbery here as a "rather minor incident" because Parker said defendant's behavior was not that upsetting, Phillips expressed no fear or concern for her own safety, no one was physically harmed, and the dollar store did not suffer any economic loss. What the dissent seems to lose sight of is the long-standing position of our supreme court that when contemplating whether a sentence is excessive, a court of review must not substitute its judgment for that of the trial court just because it would have weighed the relevant aggravating and mitigating factors differently. See, *e.g.*, *People v. Alexander*, 239 Ill. 2d 205, 213 (2010); *Stacey*, 193 Ill. 2d at 209; *Fern*, 189 Ill. 2d at 53. It is simply not our role to determine that the aggravating factors present in this case are outweighed by what the dissent characterizes as the "small, petty, and sad" nature of the crime.

¶ 26    With regard to the nature of the crime, at sentencing, defense counsel minimized defendant's use of the box cutter, arguing that there was no evidence defendant used it in an attempt to take merchandise from the store, or "to do anything other than make good on his escape." The trial court specifically addressed that argument and disagreed with it, finding that while defendant did not enter the store with a weapon drawn, he nevertheless used it during the robbery itself, as he pulled it out, opened it, and threatened Parker with it when she asked him to give her the items hidden in his clothing. The dissent also minimizes defendant's use of the box cutter, stating only that defendant "pulled out the box cutter and swore at [Parker and Phillips]." This characterization ignores the fact that Parker offered defendant the opportunity to simply hand her the items concealed in his clothing and leave the store, but instead of complying, defendant made the conscious choice to escalate the incident by pulling out a six-inch, heavy metal box cutter, extending it toward Parker, and then, on the way out of the store with Parker and Phillips, threatening either to "kill you motherfuckers with this knife" or "kick your fucking ass."

¶ 27    Similarly, we reject defendant's current argument that he merely "flashed" the box cutter. Parker's testimony was that when she told defendant she saw him stuffing items in his clothing, he cursed at her, pulled out what she believed was a pocketknife, and flicked it open. While extending the knife toward her, he either said something like "I'm not gonna give you shit," or "get the fuck out of my face." Then, when Parker, Phillips, and defendant walked past the cash registers toward the door, defendant threatened to kill Parker and Phillips with the knife. Parker stated that she never saw defendant put the knife away and identified an image of him holding

the knife in his hand while exiting the front doors. Given Parker's testimony, we cannot find that defendant merely "flashed" a box cutter as he was trying to leave the store.

¶ 28     Further, we disagree with defendant's position — shared by the dissent — that his use of the box cutter did not upset Parker. This position is based on Parker's words, "[I]t was not that upsetting." While this may seem like a straightforward statement, viewed in context, Parker's comment on her mental state is actually somewhat ambiguous. Her statement came out in the following exchange with the prosecutor:

"Q. Did the defendant then exit the store?

A. After being irate and cursing some more, yes, he did.

* * *

Q. You say [defendant] was being irate. Before he left the store, was he saying anything in front of you to you and Lakesha?

A. Yes, he was. He actually said, 'I don't have anything. What you gone [*sic*] do. I will kill you motherfuckers with this knife. You know what I am saying?' Just being — to me it was not that upsetting for a small woman like me."

We do not find, as defendant posits, that Parker's statement means she found his "flashing" of the box cutter not upsetting or, as the dissent concludes, that Parker's statement means she found defendant's behavior, taken as a whole, not upsetting. In our view, Parker's statement, "it was not that upsetting," more likely refers to defendant's verbal threats to Parker and Phillips as he was leaving the store than to his use of the box cutter or than to the incident as a whole. We also do not discount the possibility that Parker's testimony may have been inaccurately transcribed, since logically, it would make more sense for a "small woman" to be upset by threats than not to

be. In any case, we disagree with defendant and the dissent that Parker's statement, "it was not that upsetting," demonstrates that the crime was so insignificant that it merits a reduction in sentence.

¶ 29    The crime of which defendant was convicted, armed robbery with a dangerous weapon other than a firearm, is a Class X offense. 720 ILCS 5/18-2(a)(1), (b) (West 2014). Defendant was also mandatorily subject to Class X sentencing based on his criminal background. 730 ILCS 5/5-4.5-95(b) (West 2014). The Class X sentencing range is 6 to 30 years. *Id.* § 5-4.5-25(a). The sentence imposed by the trial court, 10 years, falls well within and toward the low end of this range. Given the facts of this case, the interests of society, and the trial court's stated consideration of the relevant aggravating and mitigating factors, we cannot find that defendant's sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210. Accordingly, we find no abuse of discretion.

¶ 30                                      CONCLUSION

¶ 31    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 32    Affirmed.

¶ 33    JUSTICE HYMAN, dissenting:

¶ 34    Illinois requires that sentences reflect the seriousness of the offense and the objective of rehabilitating the offender to useful citizenship. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11; *People v. Cooper*, 283 Ill. App. 3d 86, 95 (1996). Of these, the seriousness of the offense is the most influential factor. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 123; *People v. Cox*, 377 Ill. App. 3d 690, 709 (2007). This principle amplifies one of the Illinois sentencing statute's

purposes—to "[p]rescribe penalties which are proportionate to the seriousness of offenses." 720 ILCS 5/1-2(c) (West 2014); see also *People v. Hogue*, 1 Ill. App. 3d 881, 884 (1971) (applying statute in reducing sentence for burglary). The statute, in turn, stems from the Illinois Constitution. Ill. Const. 1970, art. I, § 11 (known as the "proportionate penalties clause," which requires punishment "according to the seriousness of the offense"). Yet, all too often, a sentence involving a petty offense brushes aside this statutory and constitutional priority, with little analysis or explanation beyond boilerplate language. See *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 37 (encouraging supreme court to review sentences for whether trial court followed article I, section 11).

¶ 35    The Illinois Constitution requires a trial court to impose a sentence that achieves a balance between the seriousness of the offense and the defendant's rehabilitative potential. Ill. Const. 1970, art. I, § 11; *People v. Lee*, 379 Ill. App. 3d 533, 539 (2008). But, as our supreme court recognized in *People v. Fern*, 189 Ill. 2d 48, 54 (1999), a sentence within statutory limits will be deemed excessive whenever "it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." See also, *People v. Gutierrez*, 402 Ill. App. 3d 866, 900 (2010).

¶ 36    Lundy's sentence falls within the Class X range, and the record shows that the trial court assessed aggravating and mitigating factors. Still, under the Illinois Constitution and section 1-2(c) of the Criminal Code of 2012 (720 ILCS 5/1-2(c) (West 2014)), imprisoning Lundy for 10-years imposes a sentence incompatible with the "seriousness of the offense," presenting a compelling example of a disproportionate punishment. So, with respect, I dissent.

¶ 37    Before continuing, my dissent should not be regarded as criticism of the trial judge. Rather, the punishment leveled against Lundy must be scrutinized and tested by this court under the rigors of the proportionate penalties clause, which requires that sentences be measured, rational, and commensurate with the harm done. See *People v. Stacey*, 193 Ill. 2d 203, 211 (2000) (Illinois constitution "mandate[s] that penalties be determined according to the seriousness of the offense" applies notwithstanding defendant's "reprehensible" actions). I ask, what societal interest is served by in punishing petty mischief with a grossly disproportionate sentence, almost twice the minimum, especially when the defendant, like Lundy, is poor, homeless, and addicted?

¶ 38    In my view, rather than the specific criminal act, the ultimate sentence punishes Lundy more for the numerous difficulties brought about by his economic status (impoverished), illness (drug addiction), and condition (homelessness) than for the offense for which he was convicted. How else to explain this harsh sentence? I am reminded of these words of Nelson Mandala, "A nation should not be judged by how it treats its highest citizens, but its lowest ones." Nelson Mandela, *Long Walk to Freedom*, 187 (Little, Brown and Company 1994).

¶ 39    That Lundy attempted to steal four packages of underwear valued at $33 suggests an act of desperation and not much more. For every $3.33 worth of merchandise, he received one-year imprisonment. On the scale of petty offenses, this one ranks close to rock bottom, notwithstanding his use of profanity and showing a pocketknife (also referred to as a box cutter) which, as one of the store employees testified, "was not that upsetting."

¶ 40    To show a violation of article I, section 11, requires Lundy to challenge the sentence as "cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral

sense of the community." (Internal quotation marks omitted.) *People v. Aikens*, 2016 IL App (1st) 133578, ¶ 33. The majority, however, opts to avoid the constitutional and statutory mandate.

¶ 41    The Cook County State's Attorney's Office has changed its policies and will not prosecute retail theft as a felony unless the value of the items stolen is at least $1000. See *Kimberly M. Foxx*, Cook County State's Attorney, https://www.cookcountystatesattorney.org/ about/kimberly-foxx (last visited Nov. 6, 2018) [https://perma.cc/G7J5-LFCN]. This is David Lundy's precise situation and supports finding his sentence so greatly disproportionate to the offense as to shock our local community's "moral sense."

¶ 42    Certainly, Lundy's sentence does not reflect the harm to the victims, which was negligible. The majority portrays Lundy as dangerous—a betrayal of the facts. Rather, the testimony of the two store employees describes a minor incident. Again, one employee said that Lundy's behavior was "not that upsetting for a small woman like me," and the other expressed no fear or concern for her safety. The employees were not traumatized. Despite the pocketknife and profanity, the employees did not run away or call the police to remove Lundy from the store. Instead, the two employees, both women, escorted Lundy to the door, indicating that neither woman considered him much of a threat to their safety or viewed him as someone from whom they needed protection. One employee flagged down a passing police car, but it is unclear whether the employees would have bothered reporting this crime if police had not been conveniently there.

¶ 43    Further, the Family Dollar store suffered no economic loss; the packages of underwear were immediately recovered.

¶ 44    And while Lundy's criminal background is extensive, it has not escalated in seriousness: actually, it has done the opposite. His most egregious offense (robbery and aggravated battery causing great bodily harm) took place more than 22 years before. Since then, Lundy has been convicted of drug offenses and theft. No violent crimes.

¶ 45    The most serious type of felony, aside of first degree murder, is a Class X felony, and the sentencing scheme does not differentiate between petty offenses and serious offenses. Class X was designed for the most violent and hardcore offenders, the worst of the worst. The presence of the mandatory minimum has the tendency to ratchet sentences for petty offenses upwards since it is perceived as a floor, thereby distracting from the reality of the petty offense and its comparative insignificance. Also at work is a narrative of criminality that applies to Class X offenders, catching in its web offenders, like Lundy, whose offense is neither serious nor violent nor physical.

¶ 46    Regardless of the majority's portrayal of the facts surrounding Lundy's offense and the weight afforded to his criminal history, our supreme court has demonstrated its willingness to reduce a sentence to the Class X minimum even in the context of harmful and repugnant conduct. See *Stacey*, 193 Ill. 2d at 210-11. In *Stacey*, a case favorably cited by the majority, the defendant committed a series of sexual offenses for which he was charged with aggravated criminal sexual abuse and criminal sexual abuse respectively. *Id.* at 206-07. In one incident Stacey, who was 33 years old, walked up to girls aged 14 and 15, grabbed a breast of one of them for a few seconds and then blew a kiss as he walked away. *Id.* at 206. In another incident Stacey walked up to a girl aged 18, again, grabbed her breast, squeezed it, and blew a kiss as he walked away. *Id.* The young victim tried to get a look at Stacey, prompting him to say, " 'Don't

even try it or I will knock the s*** out of you.' " *Id.* Stacey then yelled a disgusting phrase while holding his genitals. *Id.*

¶ 47    At sentencing, the girls gave statements expressing that they were afraid to go anywhere alone and were reluctant to trust anyone anymore. *Id.* at 208. Stacey's PSI revealed that he had two prior convictions for sexual offenses and five prior convictions for various burglaries and thefts. *Id.* Based on his prior criminal convictions, Stacey was Class X mandatory, and the trial court sentenced him to two consecutive 25-year terms in the Department of Corrections. *Id.* Our supreme court reduced both sentences to the Class X minimum of six years. *Id.* at 211.

¶ 48    Lundy's culpable conduct pales in comparison to that of Stacey's. This alone demands Lundy receive the minimum sentence.

¶ 49    The majority places great weight on Lundy's criminal history, crediting the trial court's finding that Lundy's past read like a "revolving door" of recidivism. Yet, the supreme court reduced Stacey's sentences to the statutory minimum of six years, even though Stacey had committed multiple offenses that bore great similarity to his present offense and had committed several other offenses besides.

¶ 50    Moreover, even accepting the majority's view of Parker's testimony as referring to Lundy's words and not his pocketknife, the direct evidence from the victims in *Stacey* was far more disturbing. They testified that they feared "to go anywhere alone," no longer felt safe, and did not trust anyone anymore. Yet, to repeat, the supreme court reduced Stacey's sentences to the Class X minimum of six-years.

¶ 51    Where a sentence falls within the Class X statutory range, *Stacey* has instructed us that the sentence can nonetheless offend the Illinois Constitution where it is "manifestly

disproportionate to the nature of the offense." *Id.* at 210. And this duty to honor our law's requirement of proportionality includes cases in which the offense is "appalling and harmful" or "reprehensible." *Id.* at 210-11. The circumstances of Lundy's offense fall far short of those in *Stacey*.

¶ 52   Accordingly, trial courts should not feel compelled to exceed the minimum for petty offenses unless the evidence *strongly* warrants it. Ten years is a severe sentence especially when the offense is of a trivial nature, and caused no physical harm to anyone. See, *e.g.*, *People v. Allen*, 2017 IL App (1st) 151540, ¶ 2 (trial court imposed 10½ year Class X sentence for breaking truck window and stealing hat and two packs of cigarettes); *People v. Busse*, 2016 IL App (1st) 142941, ¶¶ 1-2 (trial court imposed 12-year Class X sentence for stealing $44 in quarters from vending machine.) Disproportionate sentencing for minor common offenses like that of Allen, Busse, and Lundy not only overpunishes but also overburdens an already bloated criminal justice system.

¶ 53   The Class X sentencing scheme doesn't allow for flexibility for small pecuniary losses. The legislature should reevaluate Class X in regard to petty offenses so as to avoid imposing long prison sentences for repeat low level crimes. Regardless, the appellate court still must ensure a sentence passes constitutional muster. My colleagues believe that I am substituting my judgment for that of the trial court. Not true. I am not reweighing aggravating and mitigating factors; I am doing the job that I swore I would—upholding the Illinois Constitution and its laws.

¶ 54   Stripped down to its essential facts, Lundy's crime is small, petty, and sad, far from an offense that merits a decade in prison. Six years provides enhanced punishment enough, and conforms to the State of Illinois's fundamental notions of justice and morality.