*In re* MARCUS H., Minor-Appellant (The People of the State of Illinois, Petitioner-Appellant, v. Effie H., Respondent-Appellee).

First District (6th Division)   No. 1—97—1921

Opinion filed June 30, 1998.

Patrick T. Murphy, Lee Ann Lowder, and Daniel Halvorsen, all of office of Public Guardian, of Chicago, for appellant.

Rita A. Fry, Public Defender, of Chicago (Claude O. Travis, Assistant Public Defender, of counsel), for appellee.

JUSTICE QUINN delivered the opinion of the court:

The minor, Marcus H. (Marcus), through the public guardian's office, appeals from a juvenile court dispositional order entered on April 17, 1997. The minor-appellant argues that the trial court abused its discretion in declining to find that the minor had been physically abused and finding neglect instead. The minor-appellant also argues that the trial court misstated the law in requiring evidence of intent to harm or punish before making a finding of physical abuse under the Juvenile Court Act of 1987. 705 ILCS 405/1—1 *et seq.* (West 1994). We agree with the minor-appellant's contentions and reverse the court's decision.

On December 12, 1992, a petition for adjudication of wardship was filed on behalf of Marcus alleging physical abuse as a result of scalding. The father of Marcus was defaulted in the case in March of 1993.

On January 29, 1997, an adjudication hearing was held. At the hearing, the parties signed a written stipulation to the following facts and testimony.

On November 24, 1992, respondent-appellee, Effie H. (Effie), was living with her boyfriend, Stephen Dixon (Dixon), and her son Marcus, who was 14 months old. That morning, Effie went to the store, leaving Marcus in Dixon's care. Dixon was running a bath and boiling water for tea when Effie left. When she returned, Marcus had second and

third degree burns from his waist down. Effie changed Marcus' hot wet diaper and called an ambulance. The night before Marcus was burned, Effie had asked her mother to take custody of Marcus, "for insurance purposes."

Effie has two other children fathered by Dixon, Stephanie and Stephen Dixon III, who were born after the incident involving Marcus. These two children were removed from Effie's custody and were also the subject of petitions for adjudication of wardship.

The parties stipulated to the following testimony.

If called to testify, Charlene Harris (Harris), a child protection investigator with the Illinois Department of Children and Family Services (DCFS), would testify that she investigated Marcus' case. Harris interviewed Dixon on December 5, 1992, at the apartment. Dixon told Harris that after he boiled the water, he put the tea kettle on a table. Dixon said Marcus had been sleeping, but then got out of bed, went into the kitchen, and pulled the hot tea kettle off the table.

James Daniels (Daniels), a DCFS worker, would testify that he brought the petition for adjudication of wardship of Stephanie on December 18, 1993, based on a risk of harm due to Marcus' burn injuries. Marcus was discharged from the hospital one month before Stephanie was born.

Karlton Shaw (Shaw) would testify that he was the DCFS caseworker for the family when the petition for the adjudication of wardship of Stephen III was filed. Shaw would testify that Effie was in family and individual counseling and had completed parenting classes. However, she was not visiting Stephanie on a weekly basis. Dixon was not participating in parenting classes.

Exhibits were then entered into evidence. People's group exhibit No. 1, medical records for Marcus from Loyola University Hospital, was entered into evidence without objection. People's group exhibit No. 2, the curriculum vitae of the State's witness, Dr. Richard Gamelli (Dr. Gamelli), was admitted into evidence.

The following witnesses then testified at the adjudicatory hearing: Dr. Gamelli, Effie, Dixon, and Dixon's grandmother.

Dr. Gamelli testified that he is chairman of the department of surgery and professor of surgery and pediatrics at Loyola University Medical Center, and also director of the Burn and Shock Trauma Institute and chief of the burn center. At the court's suggestion, the State laid a further foundation for Dr. Gamelli's qualification as an expert witness, which included speaking at and attending dozens of seminars and lectures, visiting clinics around the country to treat hundreds of burn patients, and treating child burn patients who were victims of child abuse. Approximately 40% of the 400 patients a year

admitted to Loyola for burns are children. Dr. Gamelli authored an article that comprehensively analyzed a six-year study involving several hundred children and patterns of abuse. Abuse is part of the diagnostic scenario and part of the standard teaching in burn cases since burn injury is one of the more common mechanisms of child abuse. Indeed, the most common cause of injury to a child hospitalized for abuse and under the care of a surgeon is burns. Dr. Gamelli was chief of the burn unit at Loyola University Hospital (Loyola) since 1990. Previously, Dr. Gamelli had held various positions at the University of Vermont College of Medicine from 1979 to 1990, including professor of surgery and chief of the section of general surgery. He was also associate surgeon-in-chief from 1985 to 1990, and was founder and director of the burn program at the Medical Center Hospital of Vermont.

Dr. Gamelli testified that he treated Marcus at the burn unit at Loyola on November 24, 1992. Marcus had been admitted to a different hospital but was transferred to Loyola that same day because it had a burn center. Dr. Gamelli identified State's group exhibit No. 3(a-g) as photographs taken at the time of Marcus' admission that accurately depicted his injuries. Dr. Gamelli also identified State's group exhibit No. 4(a-d) as photographs taken several weeks later showing the skin grafts he performed on Marcus. Dr. Gamelli further identified State's group exhibit No. 5 as photographs showing an additional previous burn wound on Marcus' left arm. These exhibits were admitted without objection.

Dr. Gamelli testified that when he examined Marcus, he noted well-circumscribed burns at the waist level, extending downward to the buttocks, perineum (genitalia), and both legs. Approximately 18% of Marcus' body surface area had deep second and likely third degree burns. The deepest penetration and tissue damage was in the area of the buttocks and perineum. The right leg had more injuries than the left. Dr. Gamelli's diagnosis was that Marcus' burns were consistent with scalding from an "immersion-type injury" caused when someone is placed in a scalding liquid.

Dr. Gamelli testified that he did not find any signs that would be consistent with an injury caused by pulling a tea kettle off a table and water spilling down, because of the sharp cutoff of the wounds. There were no splash marks on the upper body and no signs of rundown. The wounds were well demarcated between injured and uninjured tissue. Dr. Gamelli testified that if Marcus had pulled the tea kettle off the table, there likely would be evidence of other "zones of contact," such as burns on the hands and splash marks. The burns on Marcus were "very well confined to the lower body."

Dr. Gamelli testified that Marcus' burns were consistent with having occurred in a bath. Immersion burns tend to have relatively sharp cutoffs, and, often in children, the wounds are over the back side, the buttocks, the perineum, and the lower extremities. Dr. Gamelli testified that while an 18-month-old child would suffer severe burns if immersed in boiling water for less than 30 seconds, such burns would occur in cooler water only if the child was immersed for a longer period of time. Such a length of time of immersion is not consistent with the burns being accidental. Dr. Gamelli testified that the pattern of burn injury on Marcus was entirely typical of child abuse. He further testified that Marcus fit the pattern for a child abuse burn victim because the typical child abuse burn victim is a male child less than two years old. The history given to Dr. Gamelli's team by Effie about the tea kettle accident did not fit the physical findings. Dr. Gamelli's diagnosis was that Marcus was a victim of child abuse.

After Dr. Gamelli's testimony, counsel for Dixon called Effie. Effie testified that the morning Marcus was burned she went to the store to get something for Dixon to eat. She testified that Dixon was going to run some bath water and boil water for tea, but he had not put the water on to boil when she left. Effie testified that the water in the apartment had to run a minute or two before it got hot, but then the water would get hot enough to cause a burn.

Effie was at the store for about five minutes. She testified that when she came back to the apartment, Dixon was holding Marcus and told her to call an ambulance. Effie testified that she saw steam coming up from the kitchen floor between the table and stove. Dixon told her Marcus had pulled the tea kettle off the table. Effie grabbed Marcus and opened his diaper, which was saturated with hot water. The skin on Marcus' leg had started peeling, and skin from his buttocks and genital area came off when she took off the diaper.

Dixon testified that he had been taking care of Marcus for approximately three or four months before the burn incident while Effie was in school during the day. Dixon testified he put water in the tea kettle and placed it on the stove before Effie left to go to the store. After she left, Dixon turned on the hot and cold faucets in the bathtub so he could take a bath. He heard the tea kettle whistling, took it off the stove and put it on the edge of a table about three feet high. He returned to the bathroom to check if the water was hot enough. He then heard Marcus pull down the tea kettle. Dixon testified that he went to the kitchen and saw Marcus sitting on the floor between the stove and the table with the tea kettle next to him and water on the floor, but Marcus was not crying. At that point, Effie came in the door. Dixon testified that Marcus was like a son to him.

Dixon's grandmother, Delois Powell (Powell), also testified on behalf of Dixon. Powell testified that Dixon treated Marcus and his two children with Effie, Stephen and Stephanie, well.

On February 4, 1997, the court heard arguments. The State requested a finding of physical abuse and neglect based on a lack of necessary care and an injurious environment under the Juvenile Court Act. 705 ILCS 405/2—3(2)(i), 2—3(1)(a), (1)(b) (West 1994). The guardian *ad litem* requested findings of physical abuse, neglect based on an injurious environment, and abuse based on a substantial risk of physical injury.

The court made the following findings:

"I don't know if Marcus pulled the tea kettle on him or not; but he may have; he may not but in either event I believe that Mr. Dixon did immerse Marcus in the bathtub and that the bathtub was filled with scalding water. I haven't heard any evidence that this was done as punishment as a means and intent on the part of Mr. Dixon to harm this child.

\* \* \*

[Dixon] indicated in this testimony that he considered Marcus like his own child; and I believe that he was sincere. I believe he did just a horrendously negligent act that resulted, that resulted in just horrendous injuries to this poor child so I find that Marcus H[.] was neglected based on a lack of care and in his exposure to an injurious environment. I'm not making an abuse finding because I just haven't heard that there was intent to harm this child. I think it was a seriously negligent act and the results were horrendous, again, to this child.

\* \* \*

[F]or me to find abuse in the [*sic*] situation I'd have to find that there was some intent to harm the child; and I don't find that there was that intent here. I think it was based on negligence."

The court denied the State and guardian *ad litem*'s motion to reconsider its ruling.

The dispositional hearing was held on April 17, 1997. Michael Julian (Julian) of the International Children's Center testified that he had referred Effie to parenting classes in January 1997. However, she registered for these classes just two days before the hearing. Julian had referred Effie to parenting classes previously, but she never completed the classes. Julian also recommended that Effie attend therapy sessions, but Effie did not complete these sessions. Also, a 1995 psychological evaluation of Effie had recommended she enroll in a GED program and receive counseling, but Effie did not enroll in a GED program. Julian testified that Effie was visiting Marcus consistently, but not her other children, Stephen III and Stephanie. Julian

also offered services to Dixon, but he did not participate. Julian offered services to William Harris (Harris), Marcus' father, in 1995 and 1996, but he refused services.

The court found Effie unable to care for the children and found Harris unable, unwilling, and unfit. The court found Dixon unable, unwilling and unfit because he had declined services and because of the nature and seriousness of Marcus' injuries. The court ordered the children placed with the DCFS guardianship administrator.

The first issue on appeal is whether the trial court's finding of no abuse was against the manifest weight of the evidence.

■ In a proceeding for the adjudication of abused, neglected, or dependent minors, allegations in a petition must be proved by a preponderance of the evidence. *In re N.S.*, 255 Ill. App. 3d 768, 776, 627 N.E.2d 1178 (1994). The primary consideration in such juvenile court proceedings is the best interest and welfare of the child. *N.S.*, 255 Ill. App. 3d at 776. A finding of abuse or neglect by the circuit court will not be disturbed on review unless it is against the manifest weight of the evidence. *In re A.P.*, 179 Ill. 2d 184, 204, 688 N.E.2d 642 (1997).

At the close of the adjudicatory hearing, the trial court found that Marcus was neglected, but not abused. For the following reasons, we find that the trial court's finding was against the manifest weight of the evidence.

■ Under the Juvenile Court Act (the Act), a minor is neglected when he or she is not receiving "the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being." 705 ILCS 405/2—3(1)(a) (West 1994).

■ The Act delineates what circumstances constitute abuse:

"(2) Those who are abused include any minor *** whose parent or immediate family member, or any person responsible for the minor's welfare, or any person who is in the same family or household as the minor, or any individual residing in the same home as the minor, or a paramour of the minor's parent:

(i) inflicts, causes to be inflicted, or allows to be inflicted upon such minor physical injury, by other than accidental means, which causes death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function;

(ii) creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function ***." 705 ILCS 405/2—3(2) (West 1994).

Moreover, the Act provides that a *prima facie* case of abuse or neglect is established in the following circumstance:

> "Proof of injuries sustained by a minor *** of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent, custodian or guardian of such minor shall be prima facie evidence of abuse or neglect ***." 705 ILCS 405/2—18(2)(e) (West 1994).

■ The facts presented by the instant case go well beyond neglect. Marcus was not a minor who was simply not receiving "the proper or necessary support, education as required by law, or medical or other remedial care." 705 ILCS 405/2—3(1)(a) (West 1994). Rather, there is *prima facie* evidence of abuse in this case. Marcus was injured by Dixon by "other than accidental means." The testimony of Dixon and Effie regarding the manner in which Marcus sustained his burns was entirely inconsistent with the testimony of the State's expert witness, Dr. Gamelli. Dixon testified that Marcus was burned when he tipped over a tea kettle Dixon had left on the kitchen table while Dixon was checking the water in his bath. Effie testified that she found Dixon and Marcus in the kitchen next to a puddle on the floor.

However, the nature of Marcus' burns was completely inconsistent with an accidental scalding theory. Dr. Gamelli testified that Marcus had well-circumscribed burns at the waist level, extending downward to the buttocks, genitalia, and both legs. The burn wounds were sharply cut off between the injured and the uninjured skin tissue. There were no injuries on Marcus' upper body, except for an old burn wound on his left arm. Had the tea kettle fallen on Marcus, he would have had splash burn wounds on his upper body. Dr. Gamelli testified that Marcus' injuries were consistent with immersion in a bath and were inconsistent with an injury caused by a fallen tea kettle. This testimony constituted *prima facie* evidence that Marcus was abused. See 705 ILCS 405/2—18(2)(e) (West 1994).

The trial court rejected Effie and Dixon's version of how the injuries were sustained and found credible Dr. Gamelli's testimony that the injuries were sustained when Marcus was immersed in scalding liquid. The trial court erred in disregarding Dr. Gamelli's testimony that the injuries were the result of abuse and drawing its own inference that Dixon was merely "negligent." As this court held in *In re Ashley K.*, 212 Ill. App. 3d 849, 890, 571 N.E.2d 905 (1991):

> "The circuit court cannot disregard expert medical testimony that is not countervailed by other competent medical testimony or medical evidence. Moreover, the circuit court, itself, cannot second-guess medical experts. If the circuit court does not follow medical evidence that is not refuted by other medical evidence, the circuit

court is acting contrary to the evidence." *Ashley K.*, 212 Ill. App. 3d at 890.

In *Ashley K.*, the circuit court ordered that the six-year-old minor, Ashley K., not receive any additional therapy and that no visitation be allowed between the minor and her foster parents of five years. *Ashley K.*, 212 Ill. App. 3d at 851-52. The circuit court rejected the recommendations of two "eminently qualified" psychiatrists, Dr. Leventhal and Dr. Zinn, in so ruling. *Ashley K.*, 212 Ill. App. 3d at 888. Both psychiatrists testified that the minor was a very "complicated" child and that she required continuing psychotherapy. Both recommended that it was in Ashley's best interest to have visitations with her foster parents of nearly five years. However, the court accepted the testimony of a psychologist, Anne Brown, and the minor's therapist at Leyden Mental Health Center, both of whom had minimal training in their fields, that Ashley K. should not have contact with her foster parents. *Ashley K.*, 212 Ill. App. 3d at 889-90. Anne Brown testified that visitation with the foster parents "would be actively harmful to the child." *Ashley K.*, 212 Ill. App. 3d at 887. Brown testified that Dr. Leventhal's report was "confusing" and that she disagreed with his recommendations. *Ashley K.*, 212 Ill. App. 3d at 888. This court took judicial notice that Anne Brown's forensic credibility also was questioned in another case, where the court held that her testimony was "questionable" because it was based upon a test that she was too "inexperienced" to conduct. *Ashley K.*, 212 Ill. App. 3d at 889. The therapist at Leyden was "a licensed social worker who 'had been out of school for about a year to a year and a half and had been licensed in Illinois for nine months.' " *Ashley K.*, 212 Ill. App. 3d at 868. Several psychiatrists who testified, including Dr. Zinn, disagreed with the therapist's judgment. *Ashley K.*, 212 Ill. App. 3d at 868. This court held that the circuit court erred in rejecting the competent medical testimony of the psychiatrists. *Ashley K.*, 212 Ill. App. 3d at 890.

Similarly, in the instant case, the circuit court should not have rejected the conclusions of Dr. Gamelli. Once the court accepted Dr. Gamelli's testimony that Marcus was burned by immersion in scalding water in a bathtub, it could not reasonably then choose to reject Dr. Gamelli's competent opinion that Marcus' burns were the result of abuse. Just as in *Ashley K.*, the trial court was acting contrary to the evidence in rejecting Dr. Gamelli's determination of abuse.

The instant case is strikingly similar to *People v. Cooper*, 283 Ill. App. 3d 86, 669 N.E.2d 637 (1996). In *Cooper*, the medical expert also testified that the minor, Reggie, could not have been accidentally burned because of the nature of his burns. *Cooper*, 283 Ill. App. 3d at 89-90. The defendant claimed that Reggie scalded himself by turning

off the cold water faucet when he left him alone in the bathtub. *Cooper*, 283 Ill. App. 3d at 91. However, the physician testified, just as in the instant case, that there was a "very sharp line of demarcation between the burned and unburned areas." *Cooper*, 283 Ill. App. 3d at 89. Reggie had first and second degree burns on his buttocks, thighs, and penis. There were no splash marks on other parts of his body, which indicated that Reggie did not fall into the tub. *Cooper*, 283 Ill. App. 3d at 90. Also, the burn wound on Reggie's buttocks was in a ring shape and was less severe than the rest of the wounds, which indicated that he was held in that position. *Cooper*, 283 Ill. App. 3d at 89-90. The physician who treated Reggie testified that it was not likely that the burns were accidental because " 'to sustain a burn in this distribution he would have had to be sitting, sitting with his feet up in the air and a child of two years of age *** would not be able to sit in a tub *** and turn on a tap.' " *Cooper*, 283 Ill. App. 3d at 90.

This court in *Cooper* held that this evidence was sufficient to establish the defendant's guilt beyond a reasonable doubt of heinous battery. The medical evidence regarding the immersion burns was sufficient to support a jury's finding that the defendant intentionally or knowingly burned the child. *Cooper*, 283 Ill. App. 3d at 93.

If the evidence in *Cooper* was sufficient to sustain the burden of proof beyond a reasonable doubt, surely the evidence in the instant case establishes abuse under the civil burden of proof by a preponderance of the evidence.

The trial court also erred in requiring evidence of intent to harm or punish in order to make a finding of abuse.

All that is necessary under the Act for a finding of abuse is that the physical injury occur by "other than accidental means." 705 ILCS 405/2—3(2)(i) (West 1994). There is no statutory requirement of specific intent to harm or punish the child. Here, the trial court specifically found that Marcus was burned by immersion in the bathtub, and not by the tea kettle accidentally falling on him. This finding alone establishes that Marcus was burned by other than accidental means. Once the trial court determined that Marcus' injuries occurred nonaccidentally, the trial court erred in refusing to make a finding of abuse. Therefore, the order of the trial court is reversed and the case is remanded for proceedings consistent with this opinion.

Reversed and remanded.

GREIMAN and ZWICK, JJ., concur.