2019 IL App (1st) 182022-U

SIXTH DIVISION
October 25, 2019

No. 1-18-2022

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| AGNIESZKA KOZIK and LESZEK KOZIK, | ) | |
| | ) | Appeal from the |
| Plaintiffs-Appellants, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 2015 CH 17913 |
| ILLINOIS DEPARTMENT OF CHILDREN AND | ) | |
| FAMILY SERVICES, an agency of the State of Illinois, | ) | Honorable |
| and GEORGE SHELDON, in his capacity as Director of | ) | Franklin U. Valderrama, |
| the Illinois Department of Children and Family Services, | ) | Judge Presiding. |
| | ) | |
| Defendants-Appellees. | ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Connors and Harris concurred in the judgment.

**O R D E R**

¶ 1    *Held*: Indicated finding made by the Illinois Department of Children and Family Services ordered expunged. Decision of the Department refusing to expunge indicated report is clearly erroneous.

¶ 2    In July 2014, plaintiffs Agnieszka Kozik and Leszek Kozik took their son K.K., a now 5-year-old boy, to the hospital when they noticed swelling in his left leg. At the hospital, doctors

found that the swelling was due to a bone fracture. In October of that year, the Illinois Department of Children and Family Services (Department) notified the Koziks that it had made an indicated finding of physical abuse against them. An administrative law judge found after an evidentiary hearing that the preponderance of the evidence supported the indicated finding and recommended that the director of the Department deny the parents' request that the indicated finding be expunged. The director of the Department adopted the administrative law judge's recommendation. The parents filed a complaint for administrative review and the circuit court affirmed the decision of the Department. The Koziks filed this appeal and, for the reasons that follow, we now reverse.

¶ 3                                    I. BACKGROUND

¶ 4     Ms. Kozik noticed that her son K.K.'s leg was swollen on July 12, 2014, when K.K. was two months old. K.K. had seen a doctor the week before for his regular shots who had not noticed any problem with him. As soon as Ms. Kozik noticed the swelling, she immediately called her pediatrician who told her to take K.K. to the hospital, which she did.

¶ 5     At Lutheran General Hospital, multiple tests were run on K.K. to determine the cause of the swelling, including x-rays, an MRI scan, and blood work. Dr. Albert Knuth, a pediatric orthopedic surgeon, concluded that the x-rays showed a new fracture in K.K.'s left leg as well as older fractures in K.K.'s right leg. Both parents were with K.K. at the hospital and, according to Dr. Knuth, their demeanor was "normal and concerned."

¶ 6     Lutheran General had a policy that all fractures in children under the age of one year be reviewed for potential abuse, and Dr. Susan Dakil, the director of their child abuse evaluation team, was called in to examine K.K. Dr. Dakil confirmed that there were bone fractures. The Department was notified and opened its investigation into K.K.'s fractures on July 14, 2014.

¶ 7     Ms. Kimberly Grant, the investigator on the case, met with the Koziks at the hospital. The Koziks told her—as they had told the doctors—that they did not know how their child's injuries occurred. According to Ms. Grant's case notes, K.K. had a soft cast on his left leg for the fractures, but otherwise appeared to be a healthy baby and not in pain. Ms. Grant's investigation of the Koziks found no history of substance abuse or domestic violence. Ms. Grant informed the Koziks that they could no longer be alone with their child and that he would have to stay with another family member. K.K. remained with relatives until August 27, 2014, when the Department returned him to his parents.

¶ 8     Ms. Grant later conducted a follow-up visit with the Koziks at their home. While she was there, Ms. Kozik suggested the two possible explanations for K.K.'s injuries that she could think of. The Koziks had a dog that could have possibly jumped on K.K., although neither of the parents had ever seen that happen. Ms. Kozik also described and showed Ms. Grant a bouncy seat that K.K. sits and kicks his legs in, and wondered if the seat could possibly have caused the fractures. As Ms. Grant talked to the Koziks further about their routines, including how and when they fed K.K, the Koziks explained that K.K. had a hard time burping after eating and would cry a lot. They were worried about his discomfort and read on an online forum about a burping method that helped babies who had trouble burping. Ms. Kozik described the method this way in her testimony during the administrative hearing: "I would take him in my arms and put his head or chin on my shoulder. And I just patted his back lightly, and I also straightened his legs, pulling them very lightly down because they tend to be bent ***." Mr. Kozik stated he burped K.K. in the same manner his wife did. Ms. Grant testified that during the home visit, the Koziks seemed like "frustrated parents that [were] ready for their child to come back home to them" and that she believed that they "didn't think anything was wrong with doing the [burping]

3

method." At this initial meeting at the Koziks' home, Ms. Grant told the Koziks to not use this method anymore and she also recommended them for parenting classes. The Koziks stopped using the burping method and enrolled, as Ms. Grant suggested, in parenting classes.

¶ 9    In October 2014, the Department made an indicated finding of abuse by bone fracture against both of the Koziks. The Koziks timely sought an administrative appeal of the Department's finding on November 11, 2014.

¶ 10    The administrative hearing occurred over three days in the summer and fall of 2015. The Koziks testified through an interpreter. Ms. Kozik testified that she was employed as a nanny and had worked for the same family for five years. Ms. Kozik's employer also testified on her behalf and confirmed that over the five years Ms. Kozik worked for her, she had absolutely no concerns about Ms. Kozik's care of her three children and that Ms. Kozik had become "part of the fabric of our family." Mr. Kozik also testified that he had experience taking care of children because he looked after his nephew. He stated that he and his wife had been hoping to have a child for a while and he felt bad when K.K. would cry after eating because he wanted to be able to provide him relief and "[n]obody wants their child to cry."

¶ 11    The Koziks and Ms. Grant all testified that the Koziks did everything that the Department asked during the investigation and that K.K., after being home since the end of August 2014, had been in perfect health.

¶ 12    Three doctors provided testimony during the hearing: Dr. Knuth, Dr. Dakil, and Dr. Christopher Sullivan, whom the Koziks visited for another opinion as to what had happened to K.K. Dr. Knuth testified that he first met the Koziks on July 12, 2014, when K.K. was brought to the pediatric emergency room of Lutheran General Hospital. He reviewed the x-rays and determined K.K. had "old and new" fractures, which he believed were caused by "a twisting type

of mechanism." He also stated he was unable to determine whether the injury was from "intentional non-accidental" or "non-intentional non-accidental" actions "without having seen the burping technique" and not knowing "the intentions of the person doing the burping technique." During the hearing, counsel for the Department described the burping method the same way that Ms. Kozik described it and asked if it could have caused the fractures. Dr. Knuth responded: "I do not believe that is consistent with the mechanism of injury which is a traction and a twisting mechanism."

¶ 13    Dr. Dakil also testified that the type of fracture K.K. had was typically caused by "twisting and pulling[,] or twisting and pushing on the knee." When asked whether the burping method could have caused the fractures, Dr. Dakil stated, "[i]f it was really a forceful, fighting mechanism, then yes, I think that that's possible." However, she also testified that if the burping method was done gently, it would not cause such fractures. Dr. Dakil testified that she thought the fracture "was some sort of trauma to the bone," and "that [the burping method] might be the trauma that would explain that ***." She further stated that, within a reasonable degree of medical certainty, she believed that the fractures were caused by non-accidental trauma. When asked if she equated non-accidental trauma to abuse, however, Dr. Dakil responded, "I typically equate those terms. I guess the burping injury thing kind of throws me off in this case because I don't know that they were trying to hurt the child, if that's really what happened." She described the Koziks to the administrative law judge as "lovely" people, who remained "respectful and polite," even as their efforts to get care for their son turned into an ongoing investigation by the Department.

¶ 14    Dr. Sullivan testified that "there is a very low probability that non-accidental trauma played a part in this presentation." Dr. Sullivan further testified that he believes only one fracture

is evident from the x-rays, while the other irregularities in the x-rays are related to metabolic bone disease, which he says K.K. has recovered from. When asked what would cause this type of fracture in a six-week-old baby, Dr. Sullivan stated, "just from handling, he could sustain a fracture like that. I'd say the most likely mechanism to produce a fracture at the proximal tibia, would be a hyperextension of the knee, that you know, the knee overextending, you know, straightening it out and then going too far." When asked if he saw any signs of abuse in the x-rays, Dr. Sullivan responded, "Well, the bone doesn't really care whether it was abuse or not abuse. You know, it just responds to the force applied, but I'd say these are not fractures that would have required a great deal of force ***." Dr. Sullivan testified that an activity where a person pulled on the leg or knee could cause hyperextension resulting in K.K.'s injury and that the fractures were "most likely due to accidental mechanisms."

¶ 15    On October 22, 2015, the administrative law judge issued her ruling. She determined that the indicated finding was supported by a preponderance of the evidence. The administrative law judge made the following findings of fact: K.K. was two months old on July 12, 2014, when his parents noticed his left knee was swollen and that K.K. was experiencing decreased range of motion and pseudo paralysis; the Koziks took K.K. to Lutheran General Hospital where he underwent numerous tests, including a physical examination, MRIs, x-rays, a bone survey, and blood work; and K.K. was "diagnosed with old and new fractures of his bilateral distal femurs and bilateral proximal tibias new in various stages of healing." The administrative law judge also found that K.K. had no developmental delays, required no medicine, and had no vision or hearing problems in July 2014. Further, K.K. was not able to crawl, roll over, or walk at that time and his parents had no history of bone disorders.

¶ 16    The administrative law judge also made factual findings concerning the burping method,

stating:

> "Both Appellants burped K[.K.] by rubbing/patting his back while holding him against their shoulder. When this method failed to produce a burp after several minutes, both Appellants straightened K[.K.]'s legs. Both Appellants held K[.K.] close to their body, held his knees and/or ankles to keep his legs in a certain position and to prevent him from falling. K[.K.] always cried during burping."

¶ 17    In her analysis, the administrative law judge stated "[n]o evidence was provided of the burping method [Ms. Kozik] testified she found on the internet for review by this fact-finder" and that "it is impossible to tell if the burping method exists, if Appellants followed the method correctly and even if the burping method was clear as to the age of the child and any possible side effects such as the potential for fractures."

¶ 18    The administrative law judge determined that because the child had multiple fractures, both old and new, "it is more likely than not the fractures were caused by the Appellants' abusive use of a purported burping method, rather than incidental/accidental in the course of administering typical parental care and, therefore, a preponderance of evidence supports the indicated finding against both Appellants in this case." On November 5, 2015, the director of the Department adopted the administrative law judge's recommendation to deny the Koziks' request to expunge the indicated reports against each of them.

¶ 19    The Koziks filed a complaint for administrative review in the circuit court. The circuit court affirmed the Department's decision, ruling that, "[p]laintiffs admitted that they were K.K.'s only caretakers. Plaintiffs further admitted to straightening K.K.'s legs and locking his knees, and holding his legs in this straightened position while burping him. K.K. cried while he was being burped" and, based on those facts, the circuit court found "it was more likely than not that

K.K.'s injuries were the result of abuse."

¶ 20    The Koziks appealed.

¶ 21                                II. JURISDICTION

¶ 22    The circuit court affirmed the Department's final administrative decision on August 21, 2018. This was a final judgment and the Koziks timely filed their notice of appeal on September 19, 2018. This court has jurisdiction under Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017).

¶ 23                                III. ANALYSIS

¶ 24    The Abused and Neglected Child Reporting Act (Act) (325 ILCS 5/1 *et seq.* (West 2014)) requires the Department to maintain a central register of all cases of suspected child abuse or neglect. 325 ILCS 5/7.7 (West 2012). The Department investigates these reports and classifies them as " 'indicated,' " " 'unfounded,' " or " 'undetermined.' " 325 ILCS 5/7.12 (West 2014). A report is " 'indicated' " "if an investigation determines that credible evidence of the alleged abuse or neglect exists." 325 ILCS 5/3 (West 2012). " 'Credible evidence of child abuse or neglect' means that the available facts, when viewed in light of surrounding circumstances, would cause a reasonable person to believe that a child was abused or neglected." 89 Ill. Adm. Code 300.20 (2010).

¶ 25    An indicated finding of child abuse against a person results in the placement of that person's name on the state's "central register" for a specified period of time. The Koziks were advised that their names would remain on the register for 20 years. The central register is not open to the general public but it may be accessed by specific persons under circumstances set out in the Act. 325 ILCS 5/11 *et. seq.* (West 2012).

¶ 26    A subject of an indicated report may request that the Department amend the record of the

report or remove the record of the report from the central register. 325 ILCS 5/7.16 (West 2012). If the Department does not do so, the subject of the report has the right to an administrative hearing within the Department to determine whether the record of the report should be amended or removed. 325 ILCS 5/7.16 (West 2012). During the hearing, the Department has the burden of proof in justifying the refusal to amend or remove the record, and the Department must prove that a preponderance of the evidence supports the indicated finding. 89 Ill. Adm. Code 336.100(e). If the Department does not carry its burden, the indicated report is expunged from the central register. 325 ILCS 5/7.16 (West 2012). After the hearing, the director receives the administrative law judge's recommendation and may accept, reject, amend, or return the recommendation. 89 Ill. Adm. Code 336.220(a)(2). The director's decision is the final administrative decision by the Department. 89 Ill. Adm. Code 336.220(a)(2).

¶ 27    On appeal, this court reviews only the director's final decision, not the decision of the Department to issue an indicated report or the decision of the circuit court. *Slater v. Department of Children & Family Services*, 2011 IL App (1st) 102914, ¶ 28; *M.D. v. Department of Children & Family Services*, 2015 IL App (1st) 133901, ¶¶ 92, 99. We review the Department's factual determinations under the manifest weight standard, any legal determinations *de novo*, and mixed questions of law and fact under the clearly erroneous standard. *Id.* ¶ 92.

¶ 28    The parties agree that this appeal involves a mixed question of fact and law. "Mixed questions of fact and law are questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard." (Internal quotation marks omitted.) *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 211 (2008). Our supreme court has made clear that an agency decision is "clearly erroneous" only where the reviewing court, on the entire record, is "left with the definite

and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *AFM Messenger Service, Inc. v. Department of Employment Security,* 198 Ill. 2d 380, 395 (2001).

¶ 29    Issues concerning abuse and neglect are decided on a case-by-case basis because abuse and neglect findings rely on amorphous concepts that are difficult to define with particularity. *Shilvock-Cinefro v. Department of Children & Family Services*, 2014 IL App (2d) 130042, ¶ 29. Where relevant, we take into account the history of the person alleged to have committed abuse. *Id.* ¶ 28. An incorrect decision by a caregiver on how to care for or discipline a child does not necessarily constitute abuse. *Lyons v. Illinois Department of Children & Family Services*, 368 Ill. App. 3d 557, 561 (2006).

¶ 30    The administrative law judge's recommendation in this case, which was adopted by the director, was that a preponderance of the evidence supported an indicated finding that the Koziks caused their son's bone fractures through physical abuse by their method of burping him. Physical abuse is defined under the Act as occurring when a parent or other caregiver "causes to be inflicted, or allows to be inflicted upon [a] child physical injury, by other than accidental means, which causes death, disfigurement, impairment of physical or emotional health or loss or impairment of any bodily function." 325 ILCS 5/3(a) (West 2012).

¶ 31    The Department's rules provide further amplification regarding bone fractures as a basis for physical abuse:

> "Bone Fractures
>
> A fracture is a broken bone or certain cartilage injuries such as a broken nose.
>
> ***
>
> Verification of the injury and the likely cause, including presence or absence of

any predisposing medical conditions that may have caused or contributed to the injury, must come from a physician, preferably an orthopedist or radiologist." 89 Ill. Adm. Code 300 APP. B, 9/59.

¶ 32    The Koziks contend that the Department's finding was "clearly erroneous" because no physician testified that the burping method they acknowledged that they used with K.K. was the "likely cause" of the fractures that were observed. The Koziks point out that of the three physicians who testified at the hearing, both Dr. Knuth and Dr. Dakil agreed that K.K.'s injuries would likely be the result of a "forceful, twisting motion," and this motion was simply not consistent with the burping method that the Koziks described at the hearing. The Koziks also point out that the third doctor, Dr. Sullivan, testified that burping was just one of many things that could have caused the one bone fracture that he observed. The Koziks argue that the Department's refusal to expunge the indicated report was clearly erroneous because, although the use of the burping method was not disputed, the regulations require that there be a medical opinion that this burping method was the "likely cause" of K.K.'s injuries.

¶ 33    The Department does not dispute the Koziks' description of this gap in the testimony but insists that the "likely cause" standard does not require a doctor's verification of the "definite" cause or even the "most likely cause." The Department cites *Bolger v. Department of Children & Family Services*, 399 Ill. App. 3d 437, 450-51 (2010), for the proposition that medical evidence need not match the language of the regulations on abuse or neglect. However, *Bolger,* which involved medical neglect rather than physical abuse, simply held that the doctors need not use the precise language of the regulations, so long as they testify in a manner that is consistent with the Department's proof requirements. There, the Department's regulations required a showing that the child's medical condition, if untreated, "could become severe enough to constitute a

serious or long-term harm." 89 Ill. Adm. Code 300 APP. B, 79. A doctor testified in *Bolger* that the failure to treat the child's burns created a risk of infection, which the court concluded was a kind of "serious or long-term harm" to the child, despite the fact that the doctors didn't specifically label it so. *Id.* at 451.

¶ 34    The problem in this case is not that the doctors used imprecise language that nonetheless satisfied the regulation's requirements. Rather, the problem is that the doctors either specifically testified that the burping method described was not a likely cause or that it was only one of many possible causes. While there is testimony from two doctors that the fractures were likely caused by a "forceful, twisting motion," the record reflects that the burping method involved merely a gentle pulling on the legs. There is no evidence that the Koziks ever used such a forceful motion when handling their son, even outside of burping. The Department has therefore failed to connect the medical testimony as to the "likely cause" with any evidence of actions by the parents. It is clearly erroneous to make an indicated finding of abuse without linking the cause of the child's injury to some action taken by the alleged abuser. See *Slater*, 2011 IL App (1st) 102914, ¶ 37 (stating "the [administrative law judge] was required to determine whether [the child's] injury was the result of [the alleged abuser's] *** conduct"). In this case the Department had evidence of certain conduct by the parents but had no medical evidence that connected that conduct to their child's injuries.

¶ 35    In addition, even if there had been evidence that the burping method was the likely cause of K.K.'s injuries, the finding by the Department was clearly erroneous because the statute requires evidence that the injury to K.K. was "other than accidental." 325 ILCS5/3(a) (West 2012). The Koziks testified without contradiction that they had no intent to hurt their son and no reason to expect that their burping method would cause fractures or other physical injury. They

did not even connect their burping method with the bone fractures until Ms. Grant suggested the connection after going over their son's eating habits with them in detail. As soon as anyone suggested that the burping method they were using could have injured their son, they immediately stopped using it. The Koziks' concern for their son was confirmed by their prompt response when they first observed an injury, by their total cooperation with the Department's investigation, and by the complete absence of any other issues as to their care of their own child or the three other children that Ms. Kozik takes care of. These considerations should have been taken into account in the Department's investigation. See *Shilvock-Cinefro*, 2014 IL App (2d) 130042, ¶ 28; *Lyons*, 368 Ill. App. 3d at 561.

¶ 36    As we have repeatedly recognized, there is no requirement that the Department prove that a party charged with abuse had the specific intent to injure or harm a child. *In re F.S.*, 347 Ill. App. 3d 55, 63 (2004); *In the Interest of Marcus H.*, 297 Ill. App. 3d 1089, 1098 (1998). But even where there is no requirement that the Department show specific intent, there must be evidence that the injury is "other than accidental." 325 ILCS 5/3(a) (West 2012). An injury is not accidental when "the prohibited result may reasonably be expected to follow from the offender's voluntary act even without any specific intent by the offender." *People v. Garland*, 254 Ill. App. 3d 827, 832 (1993).

¶ 37    The "prohibited result" in K.K.'s case was bone fractures and there was no evidence in this case that the Koziks reasonably expected that result from burping their son. The evidence was undisputed that when they first recognized that K.K. had been injured, they took him for medical treatment, and that at the first suggestion that the burping method could have injured him, they ceased using that method. There was no evidence that they knew or could have reasonably expected that the method they were using in an effort to make their son more

comfortable was actually injuring him. This court sees little difference between this situation and the more common occurrence of parents feeding their children something to which they later learn the child is allergic or allowing them to play with a toy that later gets recalled. While the parents' conduct is deliberate, the parents have no reasonable expectation that their child will be harmed by it.

¶ 38 The Koziks' burping method stands in sharp contrast to the conduct at issue in the cases cited above where we held that the Department need not show specific intent to injure a child. In *Marcus H*., 297 Ill. App. 3d at 1090-91, the mother's boyfriend immersed a 14-month-old baby in a bath that was so hot that the child had second- and third-degree burns. It was in that context that we held that abuse under the Act can be proved without showing a specific intent to harm. *Id.* at 1098. In *Marcus H.*, it was absolutely foreseeable that immersion in such hot water would harm a young child. *Id.* In *F.S*., 347 Ill. App. 3d at 60, the court found that the loop marks on the child's back and legs, the marks on his face, and a dark bruise on his eye were the product of being whipped by the caregiver's son. The fact finder rejected the explanation that the injuries arose from a one-time battle because there were both old marks and fresh marks. *Id.* at 60-61. Because loop marks, in contrast to K.K.'s fractures, can be observed by the naked eye, the caregiver in *F.S.* was on notice that leaving the child with her son was causing him injury. At that point, as this court recognized, the injury was not "accidental." *Id.* at 63-64. In this case, in contrast, if, as the Department maintains, the injuries were caused by the burping method, the injuries were accidental because there was no basis to believe that the injuries could reasonably be expected from burping and there was no evidence that the parents continued using the method once they learned that it could have been a cause of their son's injuries.

¶ 39 In short, the Department's finding was clearly erroneous because it relied on evidence

14

that the parents used a burping method, when no medical evidence connected that burping method to the child's injury and because, even if that burping method had caused an injury, it did not do so "by other than accidental means."

¶ 40                                              IV. CONCLUSION

¶ 41     For the reasons stated herein, the judgment of the circuit court affirming the denial of the Koziks' request to expunge is reversed. The decision of the Department is also reversed. The Department is directed to expunge the indicated reports against Mr. and Ms. Kozik from the central register.

¶ 42     Reversed.